THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DOUGLAS K. WHITE, Defendant-Appellant.

Fifth District No. 5—89—0323

Opinion filed February 28, 1991.

---

846

Nolan Lipsky, of Petersburg, for appellant.

William R. Haine, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, Douglas K. White, appeals from his convictions for the first-degree murder of his grandmother, Adella Vallerius, the first-degree murder of his grandmother's friend, Carroll Pieper, and the concealment of the homicidal death of Carroll Pieper. Judgment was entered on the convictions on March 16, 1989, following a jury trial in the circuit court of Madison County. Defendant was sentenced to two terms of natural life imprisonment for the two murders, and to a five-year term of imprisonment for the concealment of the homicidal death, all to be served concurrently.

Defendant raises four issues on appeal: (1) whether the trial court erred in denying defendant's supplemental motion to suppress court-ordered, eavesdropped, recorded conversations between defendant and his brother, Craig White, because the eavesdrop violated Rule 7–104(a)(1) of the Illinois Code of Professional Responsibility (107 Ill. 2d R. 7–104(a)(1)), which prohibits contact between an attorney and a party opponent who is represented by counsel without permission of that counsel; (2) whether the trial court erred in denying defendant's motion to suppress those same recorded conversations because the petition requesting court approval of the eavesdrop was factually deficient; (3) whether the trial court erred in denying defendant's motion for an evidentiary hearing to inquire into whether omissions of fact from the petition for an order authorizing the eavesdrop violated defendant's right to due process; and (4) whether the State failed to prove defendant guilty beyond a reasonable doubt of the two first-degree murders. We will address this last issue first, as our need to discuss the first three issues may hinge on our resolution of this last issue. We will set forth the facts initially only as necessary to resolve this issue, and in the light most favorable to the State, as required by *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, and will set forth additional facts as they are necessary in the context of our discussion of the other issues.

Defendant was charged by a three-count indictment dated September 22, 1988, with the first-degree murder of his grandmother, Adella Vallerius, the first-degree murder of his grandmother's friend, Carroll Pieper, and the concealment of the homicidal death of Carroll Pieper. The offenses were alleged to have occurred on December 23, 1987. Defendant pled not guilty, and jury trial commenced in the circuit court of Madison County on March 7, 1989. The following pertinent evidence was adduced.

The body of Adella Vallerius was discovered in her home in Edwardsville, Illinois, at approximately 6 p.m. on December 24, 1987, by her grandson, Douglas K. White, and his friend, Sterling Thompson. The two had been invited to dinner that evening at Adella's home. Doug arrived at Sterling's home at approximately 5:30 p.m. with a gift for Sterling and a gift for his grandmother. Doug and Sterling had never before exchanged gifts. Adella had a male friend from Chicago, Carroll Pieper, staying with her, and he and Doug's brother, Craig White, were also invited to dinner that evening.

Doug drove the short distance from Sterling's home to Adella's home. He forgot to bring his grandmother's gift, having left it at Sterling's home. Doug opened his grandmother's garage door with an automatic opener, which he customarily kept in his car. The two boys entered the garage, which was connected to Adella's house by a tunnel. They noticed that Carroll Pieper's car was not in the garage or driveway as expected. Doug remarked that it was unusual that the door from the garage into the tunnel was open. At the other end of the tunnel was a set of double doors leading into the house. These doors were also open, which was also unusual. Doug entered the house ahead of Sterling. Doug suddenly turned and retreated down the stairs, yelling for Sterling to look at his grandmother.

The two boys left the house the same way they had come in. Sterling started to run to a neighbor's house to get help, but Doug stopped him, saying he did not wish to disturb the neighbors on Christmas Eve. The boys went to Sterling's house, which was just down the street, and called the Madison County sheriff's department. The police stopped at Sterling's house to pick the boys up because Doug's garage door opener was the only way to get into the house without breaking in. The boys remained at Adella's house for approximately 30 minutes, after which they were returned to Sterling's home. Later that evening Doug left.

Donald Spaul, detective with the Madison County sheriff's office, investigated the scene. He found no points of forced entry into the house. The doors from the garage into the tunnel, and from the tunnel into the house, were standing open. Adella Vallerius was found in the dining area of the home, slumped over in a chair. Directly under her head was a pool of blood with a masonry hammer lying in it. A broken pair of eyeglasses were lying on the floor next to the chair. Spaul noticed that three chairs had been moved away from the dining room table. The victim was seated in one of these chairs. The other chairs were pushed up against the table as if no one had sat in them. In the bedroom was discovered Adella's purse with $100 in it and a

pair of men's pants with a wallet containing $4,328. The wallet also contained identification for Carroll Pieper. Red stains, later identified as blood, were found throughout the garage.

Crime-scene technician for the Illinois State Police Alva Bush testified that he photographed the scene and retrieved evidence, including samples of the red stains later identified as blood. The evidence was transported to the State Police crime lab in Fairview Heights, Illinois, for analysis. Bush also found bloodstains on the steps leading from the house to the tunnel.

Bejef Beverly Tsai, the pathologist who performed the autopsy on the body of Adella Vallerius, testified that Adella died from multiple head injuries and exsanguination from multiple blows to the head. The body showed two lacerations to the top of the head and two lacerations on the left side of the head.

Sherman Christopher Graves, a police officer at Lambert International Airport in St. Louis, Missouri, testified that on June 7, 1988, a car belonging to Carroll Pieper was found in long-term parking lot "A" at the airport. The car was wanted by the Madison County sheriff's department in connection with a homicide investigation. The Madison County sheriff's department was notified, and the car was removed by that department.

Madison County Sheriff's Deputy Steve Nonn testified that he went to Lambert Airport in St. Louis on June 7, 1988, to retrieve Carroll Pieper's car. He made a visual inspection of the inside of the car. A set of keys and a parking lot ticket were lying on the front, passenger-side seat. The parking lot ticket indicated that the car had been parked in the lot on December 23, 1987. The exterior of the car appeared to have been washed and the interior vacuumed shortly before the car was left there.

Alva Bush processed the car at the Madison County jail. No fingerprints were found on the car. It was apparent that the interior and exterior of the vehicle surfaces had been wiped down. A spare tire was removed from the wheel well under the deck in the back area of the station wagon. The tire had blood on it. There were also indications of blood on the tailgate area and the interior portion of the right rear door molding. Also found in the car were letters addressed to Pieper sent from Adella Vallerius' address dated December 5, 1987, November 24, 1987, and December 2, 1987.

Clarence Bosomworth testified that on the evening of September 9, 1988, while fishing in a lake commonly known as the "shale pit," he discovered a human body floating in the water. He notified the police. According to crime-scene technician Alva Bush, who was dis-

patched to the scene, the body was decomposing. The victim's legs were bound at the ankles with cloth and plastic. A plastic bag was tied around the victim's waist, and the victim's hands were also bound behind him with cloth strips. The body had been weighted down with a rock inside the plastic bag which was tied to the body. Several pieces of the cloth had portions of a stamp on them. Bush was able to match the pieces of cloth together so that it appeared all the strips came from the same larger cloth. The stamp consisted of a square border enclosing the words "LEASED FROM F.W. Means Co. NEVER SOLD." A similar sheet was recovered from the Vallerius residence which contained an identical stamp. Upon closer examination Bush found a white plastic bag containing a rock which was tied to the victim's ankles, similar bags containing rocks which were tied to the victim's waist, and a similar bag containing a rock which was tied to the victim's wrist. Similar white plastic bags were found in the garage of the Vallerius residence.

Pathologist Raj Nanduri, who performed the autopsy on the body, testified that the victim was later positively identified as Carroll Pieper. He had died from multiple blunt trauma to the head and manual strangulation. The blunt trauma could have been caused by blows from a hammer.

Gerald Warner is a forensic scientist who specializes in fingerprint examination for the Illinois State Police. He testified that he found Carroll Pieper's fingerprints on an ashtray which had been taken from the Vallerius home. He did not find any fingerprints on the hammer which had been found under Adella's head. He found both Adella's and Pieper's fingerprints on the letters which had been taken from Pieper's car. He found no fingerprints on the parking ticket which had been found in Pieper's car, or on any other pieces of evidence in the case.

Attorney John W. Hoefert is one of the attorneys representing the estate of Adella Vallerius. He identified a certified copy of Adella's handwritten will which appointed Doug White and Dennis Johnson as co-executors. Under the will, Adella's daughter was to receive $600 per month for life. All other property was to go to Douglas and Craig White, Adella's grandsons. The net value of the estate was estimated at $541,500.

Dennis Aubuchon is a forensic serologist with the State Police crime lab. He examines and types blood samples. He determined that Adella Vallerius and Carroll Pieper had different blood types and that some of the bloodstains found in the garage area of the Vallerius

home were consistent with Pieper's blood type, but could not have been Adella's blood.

Cheryl Cherry is also a forensic scientist with the State Police crime lab. She testified that the plastic bags found on the body of Carroll Pieper were similar in size, appearance and physical characteristics to the plastic bag found in the Vallerius garage, indicating that they were from the same manufacturer.

Penny Sparks testified that she was acquainted with defendant. After his grandmother's death, Doug told Penny that he was supposed to inherit $2 million from her estate. She never heard any similar remarks from Craig White. She admitted that she was better friends with Craig than with Doug and did not see Doug very often. Doug moved into his grandmother's home within a week to 10 days after her murder. Craig moved in sometime later.

Michelle Goden testified that she was acquainted with defendant. She also knew Craig, but she had dated Doug. Within a year prior to Adella's death, Doug told Michelle that he was only going to chiropractic school for the title and not for any financial gain. Doug was confident that his grandmother would provide for him. Within one week after Adella's death, Doug stated that whoever he married would be set for life. Doug stated that he would inherit $10 million. Doug moved into his grandmother's house within a week after her death.

Sterling Thompson testified that Doug moved into his grandmother's house approximately two weeks after the murder. About one week after the murder, Doug and Sterling were in the house preparing for Doug to move in. Doug discovered his grandmother's will. Doug asked Sterling not to tell anyone he had found it. Doug told Sterling that almost everything had been left to Doug and Craig. Doug valued the estate at $8 million. Within the month prior to Adella's death, Doug was complaining that his grandmother was not giving him enough spending money.

Joseph Archer testified that he was acquainted with defendant. He had first become acquainted with Doug at Eastern Illinois University, where both were attending classes. The two boys became very close. The two boys decided to room together when they both attended chiropractic school. The two boys finished at Eastern Illinois University in May 1987. They then worked for Sterling Thompson's father in Edwardsville for two weeks. Doug and Joseph then moved to Davenport, Iowa, to attend chiropractic school. The two boys moved in together. Both boys initially attended Mary Crest Community College to complete some prerequisites. Doug also took some

classes by correspondence. Joseph continued on to Palmer Chiropractic School; Doug did not because he had not completed all his prerequisites. Doug continued to live in Davenport although he was not attending any classes there. Doug did work part time at a bar. Toward the end of November, Doug left Davenport and came home to Edwardsville because his mother was sick and in the hospital.

In May 1987, Doug and Joseph had a conversation about Adella's will and the fact that Doug and Craig were the beneficiaries. Doug estimated the value of the estate at close to a million dollars. Doug had tried to talk to his grandmother about an investment she had made in a rolling shutter company which Doug thought was unwise. Adella refused to take his advice. Doug also discussed various investments he wished to make with his grandmother's money.

Adella paid Doug's tuition at Eastern Illinois University. She had also purchased for Doug a 1986 red Trans-Am automobile. Adella paid all of Doug's expenses in Davenport. While at Eastern Illinois University in May 1987, Doug went out often. This life-style continued until August 1987, when the boys were in Davenport. Doug stopped going out as much because he didn't have enough money. This continued until Doug returned home in November. Doug did not, however, have any trouble paying bills while he lived with Joseph. Furthermore, Doug may have stopped going out as much because he did not know many people in Davenport.

Admitted into evidence were three eavesdropped, tape-recorded conversations between defendant and his brother, Craig White. Craig White testified for the State pursuant to a negotiated plea agreement in which Craig agreed to testify truthfully about the offenses and the State agreed to accept Craig's plea of guilty to the offense of murder of Carroll Pieper, dismiss the charges of murder of Adella Vallerius and concealment of a homicidal death, recommend a sentence of 35 years' imprisonment, and not seek the death penalty against Doug. The State also agreed to recommend that Craig serve any sentence of imprisonment in a different facility than where Doug might serve any sentence of imprisonment he might receive.

In the fall of 1987, Craig was a senior in high school and lived with his mother in Edwardsville. Doug had been living away from home and Craig for several years. In the fall of 1987, Doug was 20 years of age. In November 1986, Adella purchased for Craig a 1986 Renault Alliance. Doug received a 1986 Trans-Am. Adella gave Doug large sums of money for college. Approximately November 14, 1987, Doug and Craig's mother was hospitalized in St. Louis. Craig would

visit with his grandmother almost every day and would perform numerous chores for her around the house.

When Doug returned from Davenport in November 1987, he lived with his grandmother. A couple of days after Doug came home, he told Craig that Adella was going to have a friend from Chicago come to stay with her. The friend to whom he referred was Carroll Pieper. Doug told Craig that Pieper was just coming down for Adella's money, that he wanted to marry Adella and take away her wealth. Doug expressed that he was not going to let that happen. Doug would kill him if necessary. Doug also said that, if necessary, he would kill his grandmother to prevent her giving her money to Pieper. Doug discussed various ways in which to accomplish this: alter the brakes on her car, rig her pontoon boat to sink or blow up, alter the steering in her car, suffocate her with a pillow. Doug asked Craig what was the quickest way to kill someone. Craig responded, to break their neck.

Craig and Doug both knew at this time that they were the beneficiaries under their grandmother's will. Craig did not know that he and Doug were, in effect, the sole beneficiaries. Doug frequently brought up the subject of killing Pieper and/or Adella. Doug was concerned that Adella would squander the money his grandfather had made for them. During this time, Doug sometimes stayed with Craig at the apartment and sometimes stayed at his grandmother's home.

These conversations between Craig and Doug took place within the first week of Doug returning home from Davenport and before Pieper had arrived. When Pieper arrived, Doug informed Craig. This was in mid-December. After Pieper arrived, Doug moved in with Craig. Doug continued to discuss killing both Pieper and Adella. After mid-December, Doug raised the subject on a daily basis. Doug devised a plan for killing them. Both Doug and Craig were to go to Adella's house and separate Adella and Pieper. On Monday, December 21, 1987, Doug told Craig that they would have to kill Adella and Pieper the next day. On the 22nd of December, the boys planned to go to Adella's house and separate Adella and Pieper. Doug was to kill Adella and Craig was to kill Pieper. They planned to dispose of Pieper's body and make it look as if Pieper had killed Adella and then disappeared.

Craig was scheduled to work at McDonald's the evening of the 22nd, but called in sick. They called Adella on the telephone to be sure she was home, then proceeded to her home. They went in Doug's Trans-Am. On the way, they stopped at Sterling Thompson's house. Doug went inside for a short while; Craig remained in the car. On the way to Adella's house, the plan changed. Craig was to go into the

house and kill both Adella and Pieper while Doug drove around outside. Doug would come back and pick up Craig and they would dispose of Pieper's body together. Doug drove Craig to Adella's house and opened the garage door for him with his opener. Craig had no key to the house and did not have a garage door opener. Craig entered the house through the garage and tunnel. His grandmother let him in. She and Pieper were sitting at the dining room table. The three conversed for a short time. Craig then got nervous and asked his grandmother for the keys to her car. She gave them to Craig, and Craig left in her car to find Doug. He was unable to find Doug. When he returned to his grandmother's home, Doug's car was in the driveway and the garage door was open.

Craig parked his grandmother's car in the garage. He shut the garage door and picked up a masonry hammer that was in the garage. He took the hammer with him into the house and set it down on the kitchen countertop. Adella, Pieper and Doug were seated around the dining room table. Doug had seen Craig bring the hammer. Doug looked at Craig and nodded. Doug, Adella and Pieper were arguing loudly about money. Craig sat down at the table. Adella was proclaiming that she was tired of giving Doug money, that Doug was "sucking her dry." Adella was complaining that Doug never did anything for her. At one point Pieper took Adella's side and Doug told him to shut up, that he was not a member of the family and was also after Adella's money. Doug told Adella that she was "giving my money away" on bad business deals. Finally, Pieper stated that he was going to go do some work on the house and got up and headed toward the garage. Craig got up to follow him. Doug looked at Craig and nodded. Craig followed Pieper toward the garage. They were still in the tunnel when they heard an "ugly" scream. Pieper began to run back toward the house. Craig assumed that his grandmother was dead. Craig followed Pieper down the tunnel and tackled Pieper on the stairs leading into the house and began hitting him. Craig observed his grandmother sitting in the chair with Doug standing behind her holding the hammer in his left hand. Doug is left-handed; Craig is right-handed. Craig was hitting Pieper on the head and face, but Pieper continued to struggle. Doug came over and stomped on Pieper's head, but Pieper still continued to struggle. Doug then hit Pieper on the head with the hammer once. Pieper still struggled. Craig then snapped Pieper's neck; he heard the sound. Pieper continued to moan and scream in pain. Doug then hit Pieper on the head with the hammer several times. Pieper then appeared to be dead.

Doug went upstairs into the house and dropped the hammer in the blood under Adella's head. The two boys carried Pieper's body through the tunnel into the garage. They put Pieper into the back of his station wagon. Craig and Doug then proceeded to clean up the mess so that it would look like Pieper had left the house after killing Adella. Craig went into the house and gathered up Pieper's belongings in the basement bedroom. Craig did not check the upstairs bedroom for any of Pieper's belongings.

Doug then retrieved the hammer from the puddle of blood and took it to the garage. He wiped it off with a towel and then closed Pieper's hand around it. Doug then returned the hammer to the pool of blood. The boys put two shovels in the back of the station wagon, along with the things they had used to clean up the mess. They also took a bed sheet from the house and a sheet of clear plastic. Doug also went to the sea wall (the house was located on a lake) and got some large, heavy rocks. Craig backed the station wagon out of the garage and closed the garage door. Craig drove Pieper's car and Doug drove his Trans-Am to a secluded farmer's field. They took Pieper's body out of the station wagon. They were going to bury the body but the ground was too muddy. They covered Pieper's body with leaves and brush and left it. The boys then left, Craig driving Pieper's car and Doug driving his own car. Craig parked the station wagon near his apartment. Doug followed. The boys removed the plastic, the rocks and the sheet from the station wagon and went into the apartment. They cut strips from the sheet and tied them around the rocks. The boys had decided to submerge Pieper's body in water. They put the rocks and plastic back in the station wagon. Doug then left the apartment.

The next day, December 23, 1987, during the afternoon, the boys decided to try to dispose of Pieper's car. Craig drove the station wagon and Doug drove his Trans-Am. They drove around, with Craig following Doug, finally stopping at a car wash. They threw all the items they had taken from Adella's house into a trash bin. They sprayed down both the inside of the wagon and the outside, and they dried the car, wiped fingerprints off and vacuumed the inside. They then continued to drive around in an attempt to find a place to dispose of the station wagon. They finally parked the car at a small airport in the Granite City/Cahokia area. They then both drove around in Doug's car, trying to find a better place to leave the station wagon. They decided to try to submerge the car in Horseshoe Lake. They returned and got the station wagon and drove it to Horseshoe Lake, but could find no place to drive it into the lake. They then decided to

leave the station wagon at Lambert Airport in St. Louis. Craig drove the station wagon to St. Louis, following Doug in the Trans-Am. They parked the wagon in long-term parking. Craig left the parking lot ticket on the dash of the car and left the keys on the seat. The boys then went to a hospital in St. Louis to visit their ailing mother to establish an alibi. They still had their bloody clothing from the night before in plastic bags in Doug's car. They stopped at a restaurant in Collinsville and put the bags in the trash dumpster. They then went to get Pieper's body. They had decided to submerge Pieper's body in what is known as the "shale pit" in Edwardsville. They went to the farmer's field where they had left the body and put it in the back of Doug's car. They tied the rocks to Pieper's body with the sheets. They went to the shale pit and threw Pieper's body in. They then returned to the apartment. Doug went out; Craig stayed in.

The boys had discussed how they were going to "discover" Adella's body. Doug and his friend, Sterling Thompson, would go to Adella's home for Christmas Eve dinner and "discover" the body. Craig would be at work that evening.

Craig testified that in January or February 1988, he had a conversation regarding Carroll Pieper with several of his friends, including Lynn Hollowich. Craig told Lynn that he had killed Pieper and disposed of the body in the shale pit. Craig told Lynn this because she believed that Pieper had killed Craig's grandmother and that he might still be around and might harm Craig. Craig wanted to ease her mind. Craig had told Lynn that he had discovered Pieper at his grandmother's house immediately after Pieper had killed his grandmother, so Craig killed him and disposed of the body. In the middle of September 1988, sometime after Pieper's body had been found floating in the shale pit, Craig received two telephone calls from Lynn Hollowich in which they discussed what Craig had told her in regard to Carroll Pieper. Lynn asked Craig if what Craig had told her in January was true and Craig told her that it was. Later that same day, Craig was informed by the police that his conversations with Lynn had been eavesdropped upon and recorded. At that time, Craig agreed to engage in a conversation with his brother, Doug, upon which the police would electronically eavesdrop.

On the evening of September 19, 1988, Craig engaged Doug in two telephone conversations and one personal conversation which were surreptitiously recorded. These recordings were played for the jury. In the first conversation, Craig told Doug that the police had been to talk with Lynn and were looking for Craig, and would probably be looking for Doug. Doug told Craig not to worry and to come

home so that they could talk. In the second conversation, Craig accused Doug of killing Pieper. Doug told Craig to shut up and meet him at the Moto Mart gas station. Craig again accused Doug of killing both Adella and Pieper. Doug told Craig, "[D]on't be stupid," and they agreed to meet at Moto Mart. At Moto Mart, Craig told Doug that the police were looking for them and that they had to get their stories straight. Doug told Craig, "You already blew my cover, you said it on the phone twice. You said it, I did it on the phone, twice, Craig. You're scarin' me. You do it again and I'm gonna really get pissed off. *** You fingered me man, you fingered me." Craig then told Doug that he had told Lynn that he killed Pieper and disposed of the body in the shale pit. Doug said, "So you told her, and she went and told some people?" Doug told Craig to listen to his older brother. Craig protested that he had not done anything. Doug said, "I know you didn't, I know you didn't. But if you roll over on me, they're goin' to get you. We can't, we can't roll over on each other. Now, listen—Craig, they don't want you, you know whose fingerprints they found on the body? *** Mine." When Craig became excited, Doug said, "Easy with me Craig, don't press your f----g luck. You already fingered me today and probably convicted me on the phone." Doug told Craig, "You won't live to go to jail. *** Don't ever talk on the phone about that shit again, okay?" Doug attempted to reassure Craig that the police did not have an indictment against them. When Craig stated that the police had found their fingerprints in Pieper's car, Doug stated, "So what, I rode in that car, and you got in it one time to get some tools out. See you're goin' a little too hard on this." Doug told Craig, "You know what [the police] want? They want you to finger me out for it. That's what I think that they want. Okay? They want you to say I did it, or you to incriminate yourself. I told you, *** not to say nothin' ***." Doug advised Craig that if the police questioned him, he should advise them to speak with his attorney. When Craig told Doug that the police might arrest them at any time, Doug said, "Right, so what? We've known that for nine months." With reference to the police finding Pieper's body, Doug said, "That doesn't mean nothin'. That's a nine month old body that's been in the water for nine months. *** And they got some fingerprints, maybe one, maybe two, maybe whatever, but I know if they're my fingerprints, it's easily explained because I met the guy and I told them I rode in the car with him and stuff, okay?" Doug assured Craig that the police did not have enough evidence to obtain an indictment. Doug asked Craig if Craig was going to "roll over" on Doug. When Craig said that he had not done anything, Doug responded, "Craig, you

didn't do anything, we, I, neither one of us did. Okay?" Doug stated that when things "go down," he was going to remain calm. Doug said, "Hey, I'm in it as deep as you, pal. *** You don't understand that. but I'm in it just as deep, maybe deeper than you cause you're a juvenile. I'm in it one hell of a lot deeper than you are, pal. Do you realize that? Do you realize you cannot convict, they're going to convict us both on manslaughter charges." Doug repeated that he was going to remain calm, "that if they want to arrest us for this, they're gonna arrest us for this, okay? If they want to get us, they will get us, no matter what. If they want to make a charge, we will have, we will be charged, and that's just part of it. And if not you know, if not, we won't." Doug told Craig that the next day they would go speak with their attorney. Doug advised Craig that his statements to Lynn Hollowich about killing Pieper were "not good evidence" because Craig had been drunk at the time he made the statements. When Craig told Doug that the police would find Doug's fingerprints on Pieper's body, Doug responded, "Right, but they have to prove that I killed him. My fingerprints weren't on the murder weapon, right? That's about enough to not get you convicted right there, practically, you know. Your fingerprints weren't [sic] on the murder weapon, it was his fingerprints on the murder weapon, so it looks like he killed her. So, they can't convict me of killing her, right? They can't convict you of killing her cause his fingerprints are on the murder weapon. So who killed him? Just because our fingerprints are on the body doesn't mean that we killed him. It's circumstantial, man. Keep your f---in' mouth shut from now on, man. You're f---in' crazy. You're gonna bring us down if you keep it up, if you don't get calmed down, you're gonna kill us both. If you don't calm down, Craig, and you ruin it, I won't kill you, I'll just kill myself." The conversation ended and the boys agreed to meet at home.

Immediately after this conversation, Craig was returned to the sheriff's department, where he was arrested for concealment of a homicidal death. Doug was arrested later that evening and charged with two counts of murder and concealment of a homicidal death. Craig was subsequently released on bond.

On September 26, 1988, Craig visited Doug in jail. Doug told Craig to write a statement to Doug's attorney telling him that everything Craig had said against Doug was false. Doug told Craig that, if Craig would do this, when Craig got out of jail Doug would give him the rest of the money which Doug did not spend while he was in jail. Craig refused. Later, Craig was also charged with two counts of mur-

der and taken into custody. He remained in custody at the time of trial.

On cross-examination, defendant tried to establish that Craig resented Doug because Adella gave Doug more money than she did Craig, while Craig did all the work around the house for Adella. Craig denied any such resentment. Defendant also attempted to impeach Craig through use of the numerous inconsistent statements he had made to the police. Craig admitted that he had lied to the police in some of these statements. Defendant also cross-examined Craig about statements he had made after his arrest to inmates in his cell block. Craig told them that Pieper had killed Adella and Craig had then killed Pieper. Defendant cross-examined about a letter Craig wrote to Doug in which Craig thanked Doug for trying to cover up for him. Craig testified that, before he was finally arrested, he planned to leave the area. He wrote several letters to people in which he stated that Doug was not involved in the murders and that Doug was telling the truth. At trial, Craig stated that these statements in the letters were lies.

On redirect examination, Craig testified that while both he and Doug were in jail, he had received a letter from Doug in which Doug asked him not to testify against him. Doug asked Craig to "plead the Fifth," stating that if they both did so, they would be acquitted. Doug also directed Craig to tear the letter up and flush it down the toilet after reading it. It was in response to this letter that Craig wrote the letter back to Doug thanking him for attempting to cover up for him. Craig explained that he told other inmates that he killed Pieper after Pieper killed Adella because he and Doug had planned to testify that the night of the murders they were leaving Adella's house when they heard her scream. Pieper had killed her, so Craig killed Pieper. They disposed of the body together.

Jason Perry testified for the State that he had been best friends with Craig White. In late November 1987, and up until the time of Adella's death, he and Craig had several conversations in which Craig told Jason that Doug White was planning to kill Adella to get her money. The two boys decided that Doug was just talking and that he would not go through with it. Craig told Jason that he was afraid of Doug because Doug was "talking crazy." On cross-examination, Jason testified that after the murder Craig had told Jason that Doug did not do it.

The State rested and the defendant called Lynnette Hollowich. She testified that on September 17, 1988, she had engaged Craig White in a telephone conversation which was surreptitiously recorded

by the police. The tape recording of this conversation was played for the jury. In that conversation Craig admitted that he had told Lynn the truth when he had told her that he killed Carroll Pieper and threw his body in the shale pit. On September 19, 1988, Lynn had another recorded phone conversation with Craig. Lynn told Craig that she had heard that Doug had killed Pieper. Craig vehemently denied it. Craig stated that he had killed Pieper because Pieper had killed his grandmother.

Dennis Johnson testified that he is a veterinarian who resides in Decatur, Illinois. He first met Doug White when Doug was 12 years of age. Dennis' son and Doug were friends. At the end of Doug's junior year in high school, he went to live with Dennis in Decatur. Doug finished high school there. Dennis also knew Adella. When Doug went to Eastern Illinois University, he roomed with Dennis' son, Drew. Dennis and Adella purchased a mobile home for the boys to live in. Adella furnished the inside of the mobile home. Dennis was also co-executor of Adella's will. He testified that he did not know this before Adella's death and that he had never discussed it with Doug until after Adella's death. Dennis maintained an apartment in Belleville because he worked as a veterinarian at Fairmount Race Track in Collinsville. After Adella's death, Doug and Craig lived with Dennis in that apartment for approximately one month to six weeks. Adella had been planning to buy Doug a new set of tires for his car for Christmas. They would have cost approximately $500.

Todd Wise testified that he was friends with Craig White. After Adella's death, Craig stated often that he was going to inherit a large sum of money.

Doug White testified in his own behalf. He was 21 years of age at the time of trial. After his junior year in high school, Doug had moved to Decatur to live with Dennis Johnson because Doug and his mother were not getting along. While living with Johnson, Doug received money from his grandmother as well as an automobile. Adella paid the insurance on the car. Whenever Doug returned home to visit, he stayed with his grandmother. Adella paid Doug's tuition at Eastern Illinois University, as well as his housing expenses. Adella also gave Doug spending money. This continued through Doug's years at Eastern. In 1986, Doug's grandmother bought Doug a new Trans-Am automobile. Doug did not see much of Craig after he left home in high school. Doug testified that Craig was jealous and mad that Doug was receiving so much money from Adella when Doug was not doing any work for her around her house. This attitude continued until Adella's death. Doug had received a Trans-Am, a sports car, while Craig had

only received a Renault Alliance, an economy car. When Doug went to Davenport to prepare for chiropractic school, Adella paid his housing expenses and tuition and gave Doug spending money. Doug testified that he experienced no change in life-style at Davenport and that his grandmother continued to give him the same amount of money. He did not go out socially as often as he had at Eastern Illinois University because he did not know as many people. When Doug returned home from school, he always resided with his grandmother. When he returned home in November 1987, he resided with his grandmother. Shortly after Thanksgiving, Doug left his grandmother's and moved into the apartment with Craig to keep an eye on Craig.

On several occasions, Doug had discussed with his friend, Joe Archer, investing in a fast-food restaurant. Doug hoped to get the money for the investment from his grandmother or from Dennis Johnson. Doug also told Joe that his grandmother owned some property and that Doug would inherit from her some day. Doug did not know for certain, however, that he would share in his grandmother's estate. He assumed this was so because he was one of Adella's few close relatives. Doug had never seen Adella's will prior to her death. He did know, however, what some of her assets were.

Doug returned home in November 1987 because his mother had suffered a heart attack and was hospitalized. His relationship with Craig was not good at this time, and he did not see Craig often. Doug denied telling Craig that they should kill Adella. Doug did not learn of Carroll Pieper until one or two days before he was to arrive at Adella's home. Doug saw Pieper approximately three times prior to Adella's death. The last time Doug saw Adella and Pieper was December 19, 1987. After Doug returned home in November 1987, his grandmother continued to give him spending money. Adella never told Doug that she was going to withdraw or curtail her financial support.

Doug never told Craig that Carroll Pieper was going to come live with Adella and never told Craig that they should kill Pieper. Doug never complained to anyone about a lack of money after he returned home in November 1987. Doug never formulated any plan to kill his grandmother. Adella had told Doug that Pieper would be paying rent when he moved into Adella's home. Doug did, however, feel that Pieper was "sponging off" his grandmother. Doug had also tried to advise his grandmother that she was being taken advantage of by a business associate. Doug did not believe that his grandmother and Pieper had any plans to marry. He did not know how long they had known each other. Doug assumed that Pieper was staying in a different bedroom than Adella.

The week of the murders, Doug knew that Sterling Thompson had been invited to Christmas Eve dinner, but Doug had not invited him. Craig's car was not working that week. On December 21, Doug loaned Craig his car. The car contained a garage door opener for Adella's garage. On December 22, Doug again loaned Craig his car. On that date, Craig left the apartment in Doug's car at 4:30 or 5 p.m. Approximately one hour later, Craig returned to the apartment. He was crying and had specks of blood on his shirt. Craig stated that Adella was dead, that Pieper had killed her and then attacked Craig. Craig had then killed Pieper. Doug and Craig left and went to Adella's home so Doug could see what had happened. The boys entered the garage and began walking through the tunnel. Doug had noticed that the doors from the garage to the tunnel and from the tunnel to the house were open. This was unusual. Pieper's body was lying on the landing. There was blood on the walls and ceiling and a hammer lying next to his head. Doug had never seen the hammer before and did not know where it came from. When Doug went up the steps toward the house he saw his grandmother's body slumped over in the chair. Craig was begging Doug to help him—he was worried and upset that he had killed a man. Both boys were crying. Doug decided to get rid of Pieper's body to protect Craig.

The boys picked up Pieper's body and carried it through the tunnel into the garage. They laid the body beside Pieper's car, leaving bloodstains on the refrigerator and floor. They placed Pieper's body in his station wagon and covered it with materials from the garage. The boys then cleaned Pieper's blood from the landing area, the tunnel and the garage. While cleaning, Doug got some blood on his clothing. They put a shovel and a spade in the station wagon because they had decided to bury Pieper's body. They put the materials they had used to clean in the station wagon. Craig gathered Pieper's belongings from the guest bedroom and put them in the car. Doug never touched the hammer that was lying next to Pieper's head. Craig said he knew a place where they could bury the body. Craig drove Pieper's car; Doug followed in his Trans-Am. They arrived at a rural location. The boys carried Pieper's body from the car. The field was muddy and frozen and the boys could not dig a hole. They placed Pieper's body in the woods, covered it with brush, placed the shovels back in the station wagon and returned to the apartment. Craig parked Pieper's car near the apartment. Craig took the shovels and threw them into the woods behind the apartment. The boys took the clothes they had been wearing and put them in a trash bag. Doug got cleaned up and went to Sterling Thompson's house. Doug wanted to get away from Craig.

Doug returned to the apartment at 1:30 a.m. Craig was watching television. The boys discussed what they were going to do with Pieper's body and car. At 2:30 that morning, the boys loaded the bags of soiled clothes into Doug's car. They left, with Doug driving his own car and Craig driving Pieper's station wagon. They stopped at a hotel in Collinsville and threw the cleaning materials from Pieper's car into the dumpster. They stopped at a gas station in Edwardsville and threw the bags of clothing into the dumpster. They finally left Pieper's car at Parks Airport in Cahokia. They returned to the apartment.

Upon awakening the next day, the boys decided to clean Pieper's car to remove any evidence and move it to Lambert Airport in St. Louis. At 2 p.m. on December 23, Doug retrieved the shovels from the woods behind the apartment. He threw them in the dumpster at a nearby hotel. They retrieved Pieper's car and took it to a car wash in Cahokia, where they cleaned it and vacuumed it and dried it off. They threw the materials in the car into a dumpster at the car wash. They then drove around the Mississippi River looking for a place where they could sink Pieper's body. They were unable to find one. Craig suggested sinking the body in the shale pit in Edwardsville. The boys then took Pieper's car to Lambert Airport and proceeded to the hospital to visit their mother. This was approximately 6 p.m. The boys returned to their apartment, and Doug went to Sterling Thompson's home. When Doug returned late that night, he awakened Craig, and the boys decided to dispose of Pieper's body that night. They took a blue blanket, some trash bags and a canvas bag from the apartment. They went to the lake on which Adella's home was situated and got five to eight large rocks. The boys went to the location of Pieper's body. They tied Pieper's feet and hands together with plastic bags, wrapped his body up and placed it in the back of Doug's car. They took a sheet from the apartment and cut it into strips. The sheet bore the stamp which the police had found on it. The sheet was similar to ones found at his grandmother's home and came from the linen company which supplied linens for the hotel owned by Adella. They tied the sheet strips to rocks, and then to plastic bags containing rocks. They tied the sheets to the body and drove to the shale pit. Craig and Doug carried the body to the pit and threw it in the water.

On Christmas Eve, Doug "discovered" his grandmother's body with Sterling Thompson. Craig found Adella's will in her home on December 26. Doug was surprised to learn that he would receive one-half of his grandmother's estate. After Adella's death, Doug and Craig resided with Dennis Johnson in his apartment for three weeks. They then moved into Adella's house. Doug and Craig agreed that if

they were questioned about the death, they would act as if they knew nothing.

With respect to the recorded conversations between Doug and Craig, Doug testified that he was upset with Craig for accusing him of the murders when Craig knew that Doug had not committed them. Doug told Craig to shut up. When Doug accused Craig of "blowing his cover," Doug was referring to his cover for concealing a homicidal death. Doug could not believe that Craig was "fingering him" for killing two people when Craig knew he had not done it. Doug tried to calm Craig by showing him how the incriminating evidence could be explained away.

With respect to the conversation at the jail, Doug explained that he simply begged Craig to tell the truth. Craig refused. Doug never offered Craig any money to talk. Doug admitted his guilt to concealing the homicidal death of Carroll Pieper.

On cross-examination, Doug testified that, while they were cleaning up Adella's garage after the murders, Craig took the hammer and cleaned it, then wrapped Pieper's hand around it in an attempt to place Pieper's fingerprints on it.

The defense rested. The jury returned with verdicts of guilty on all counts.

On appeal, defendant argues that he was not proved guilty beyond a reasonable doubt of the two murders. He first argues that the State failed to prove defendant's motive to commit the murders because: (1) the evidence that defendant knew the extent of his possible inheritance from Adella, and that he bragged of that anticipated inheritance, was contradictory and not convincing; (2) the evidence that Adella was withdrawing her financial support from defendant was insufficient and unconvincing; and (3) the evidence that defendant feared a financial loss as a result of Adella's involvement with Pieper was insufficient in that most of such evidence came from Craig White, whose testimony was incredible, and the evidence showed that defendant had no reason to think that Adella's relationship with Pieper was serious. Secondly, defendant argues that he was not proved guilty beyond a reasonable doubt because the evidence establishes Craig's motive to kill Adella and Pieper, as well as his guilt in the murders, and Craig's testimony was completely incredible in light of the numerous inconsistent statements he had made and his need and desire to exculpate himself by incriminating his brother. Because defendant's conviction was based primarily on Craig's unconvincing testimony, and in light of his own convincing testimony, defendant argues that he was not proved guilty beyond a reasonable doubt of the two murders.

We begin by stating that motive is not an essential element of the offense of murder and need not be proved in order to sustain a conviction for murder. (*People v. Richards* (1976), 40 Ill. App. 3d 717, 721, 353 N.E.2d 74, 78; *People v. Rowe* (1977), 45 Ill. App. 3d 1040, 1046, 360 N.E.2d 436, 504.) Thus, although evidence of a defendant's motive in committing a crime may tend to prove his guilt, where the evidence of the defendant's commission of the offense is sufficient to sustain a conviction, failure by the State to prove the defendant's motive does not require reversal of the jury's verdict. The question, then, is whether the evidence as a whole is sufficient to prove defendant guilty of committing the essential elements of the offense of murder.

The evidence is sufficient if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Although the testimony of an accomplice is viewed with suspicion, it is sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) To a large extent in the instant case, as in *Collins*, the resolution of the defendant's guilt or innocence depended on the credibility of the witnesses and the weight given their testimony. These determinations are exclusively within the province of the jury, and it is for the jury to resolve any conflicts in the evidence. (*Collins*, 106 Ill. 2d at 262, 478 N.E.2d at 277.) Not only must we view all the evidence in the light most favorable to the prosecution (*Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277), but we must assume that the jury resolved all controverted facts and questions of testimonial credibility in favor of the prosecution. *People v. Lagle* (1990), 200 Ill. App. 3d 948, 558 N.E.2d 514.

In the instant case, the jury observed the witnesses and heard their testimony. They apparently believed Craig's testimony and disbelieved defendant's testimony and resolved the conflicts in the evidence against the defendant. We cannot say that no rational trier of fact would have done the same. We think the evidence is sufficient to sustain defendant's convictions of both murders.

We turn now to the remainder of defendant's arguments, which relate to the admissibility of the eavesdropped, recorded conversations between defendant and his brother, Craig. On September 19, 1988, after obtaining authorization from the State's Attorney of Madison County to do so, Detective Ronald Tune of the Madison County sheriff's department presented to the circuit court of Madison County a petition for order authorizing use of an eavesdropping device. The pe-

tition alleged the commission of the homicides and that Pieper's body had been found in the shale pit. It alleged that the police had been informed by Lynn Hollowich, a close friend of Craig's, that prior to Pieper's body having been found, Craig had told her that he had killed Pieper and thrown his body in the shale pit. It alleged that in an interview with Craig White on September 19, 1988, Craig had told members of the Madison County sheriff's department that he had discovered defendant placing Pieper's body into the back of a car at Adella Vallerius' residence, that defendant told Craig that he had killed Pieper and Adella and that Craig had helped defendant dispose of Pieper's body. The petition further alleged that Craig had agreed to contact defendant and discuss defendant's admissions and conduct. The petition alleged that based upon this information there was reasonable cause to believe that defendant had committed a felony and that conversations concerning that felony would be obtained through the use of an eavesdropping device. Attached to the petition was Craig White's written consent to the eavesdrop. The petition was granted on September 19, 1988, and the conversations between Craig and defendant occurred and were recorded that evening.

■ On January 24, 1989, defendant filed a supplemental motion to suppress the recorded conversations as having been obtained in violation of Rule 7—104(a)(1) of the Illinois Code of Professional Responsibility. Rule 7—104(a)(1) prohibits any lawyer from communicating or causing another to communicate with a party he knows to be represented by a lawyer unless he has the prior consent of the lawyer representing that party or unless he is authorized by law to do so. 107 Ill. 2d R. 7—104(a)(1).

The supplemental motion to suppress alleges that on January 5, 1988, prior to the filing of any charges in this matter, attorney Joe Hoefert informed Detective Sergeant D. H. Spaul of the Madison County sheriff's department that he represented defendant and that prior to any additional contact with defendant, Hoefert desired to be contacted and intended to be present during any questioning. The motion further alleges that the knowledge possessed by Spaul in this regard is imputed to Detective Ronald Tune, that Spaul witnessed Craig White give his consent to the eavesdrop and that the State's Attorney of Madison County had authorized Detective Tune to make application for an eavesdrop order. The motion alleges that Rule 7—104(a)(1) applies in criminal as well as civil cases and to nonattorney government law enforcement officers when they act as the alter ego of the government prosecutor. The motion alleges that Detectives Spaul and Tune were acting as the alter egos of the Madison County State's At-

torney in that they were authorized by that State's Attorney to make application for the order authorizing the eavesdrop. Finally, the motion alleges that despite Detectives Spaul and Tune's knowledge of defendant's representation by an attorney, they caused Craig White to function as a government informant in an attempt to elicit incriminating statements from defendant in violation of the Code of Professional Responsibility and that that violation requires suppression of the recorded conversations.

Hearing was held on the motion on January 30, 1989. Defendant made clear that his motion was not based upon the sixth amendment right to counsel, which does not attach prior to the filing of charges. The court took the motion under advisement and, on March 7, 1989, denied the motion. Defendant appeals.

On appeal, defendant reaffirms that his argument is not based on the sixth amendment right to counsel which, he concedes, had not attached to defendant at the time of the court-ordered eavesdrop. Neither party has pointed to, nor are we able to discover, any Illinois cases which deal with this issue. Both parties, however, refer us to Federal cases which discuss this precise issue under rules identical to Rule 7—104(a)(1) of the Illinois Code of Professional Responsibility. While these Federal cases are not binding on us (*People v. Kidd* (1989), 129 Ill. 2d 432, 457, 544 N.E.2d 704, 715), they may certainly aid us in our analysis of this issue and we will therefore consider them.

In 1972, the Seventh Circuit Court of Appeals held that Rule 7—104(a)(1) of the Illinois Code of Professional Responsibility applies in criminal cases as well as civil cases. (*United States v. Springer* (7th Cir. 1972), 460 F.2d 1344, 1354.) The court refused, however, to invoke its supervisory power to suppress a written confession which a police officer had elicited from an accused who was in custody and represented by counsel where the court found that the accused had elected to speak without the presence of his counsel pursuant to his plan to obtain judicial leniency in return for his cooperation. The court did, however, recognize that in a proper case it might invoke its supervisory power and impose a sanction for a violation of Rule 7—104(a)(1).

*United States v. Lemonakis* (D.C. Cir. 1973), 485 F.2d 941, involved a surreptitiously recorded conversation between a government informant and the defendant prior to his indictment but while the prosecutor knew that defendant was represented by counsel. The recording was admitted against defendant at his trial. On appeal, defendant argued that the eavesdrop violated Disciplinary Rule 7—

104(a)(1) of the American Bar Association Code of Professional Responsibility, which is identical to the same provision in the Illinois Code. The court held that the rule does not embrace a conversation between an informant and the defendant where the informant's instructions from the prosecutor are merely to induce the defendant to talk. In such a case, the informant does not constitute the alter ego of the prosecutor because the defendant is not "in danger of being tricked by a lawyer's artfully contrived questions into giving his case away." 485 F.2d at 956.

A similar result was reached under similar circumstances in *United States v. Kenny* (9th Cir. 1981), 645 F.2d 1323. The court there held that the government's use of the investigative technique of recording eavesdropped conversations in a noncustodial environment prior to arrest or indictment does not implicate the sorts of ethical problems addressed by the Code.

In *United States v. Jamil* (2d Cir. 1982), 707 F.2d 638, the government appealed from an order of the district court suppressing and excluding from evidence a tape recording of a conversation between the defendant and a government informant. Defendant had argued, and the district court agreed, that the recording had been obtained in violation of Disciplinary Rule 7—104(a)(1) of the Code of Professional Responsibility. The recording was made prior to defendant's indictment but sometime after the prosecutor had been informed that defendant was represented by counsel.

On appeal, the circuit court held that the rule applies in criminal cases and to government attorneys. The court further held that the rule may apply to nonattorney government law enforcement officers when they act as the alter ego of the government prosecutors. However, the court held, the rule would not require that government investigatory agencies refrain from all use of informants to gather information by tape-recording conversations with a suspect. Relying on its decision in *United States v. Massiah* (2d Cir. 1962), 307 F.2d 62, *rev'd on other grounds* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, the court concluded that, so long as the government investigators were not acting as the alter ego of the prosecutor, no violation of the rule had occurred.

The court further found that the investigators had not been acting as the alter ego of the prosecutor because, at the time the recording was made, the prosecutor was not even aware of the eavesdrop. Therefore, although the rule applied to the defendant at the time of the eavesdrop, no violation of the rule occurred. The court expressly declined to answer the question whether the rule would have been vi-

olated in this context if the investigator had been acting as the prosecutor's alter ego or to decide whether suppression would have been warranted if the disciplinary rule had been violated. Under the circumstances, the circuit court held that suppression of the tape constituted an abuse of the trial court's discretion.

In *United States v. Dobbs* (8th Cir. 1983), 711 F.2d 84, a Federal law enforcement officer obtained a statement from a defendant who had not yet been charged, but who was represented by counsel. On appeal, defendant argued that the court should have exercised its supervisory power to suppress this statement because it was obtained in violation of Minnesota's Code of Professional Responsibility Rule 7—104(a)(1), which is identical to the rule in Illinois. The court refused, stating that the rule does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously had retained counsel. The court recognized that, although in some circumstances the conduct of a prosecutor and an investigator *acting at the prosecutor's behest* may implicate the ethical concerns addressed by the rule, this noncustodial interview prior to initiation of judicial proceedings did not constitute an ethical breach.

In *United States v. Sutton* (D.C. Cir. 1986), 801 F.2d 1346, the court held that Rule 7—104 was never meant to be used to exclude preindictment tape-recorded conversations between defendant and an informant but was meant to ensure that lawyers not prey on persons known to be represented by counsel.

Finally, in *United States v. Hammad* (2d Cir. 1988), 858 F.2d 834, a government informant recorded a conversation with defendant during the course of which, pursuant to instructions from the prosecutor, the informant showed the defendant a sham grand jury subpoena which had been prepared by the prosecutor, and falsely told defendant that he had been subpoenaed by the grand jury. Upon defendant's motion, the district court suppressed the tapes, finding that the prosecutor had violated Disciplinary Rule 7—104(a)(1). The government appealed.

The circuit court of appeals agreed with the district court that the disciplinary rule had been violated, but reversed the order suppressing the evidence for the reason that the law prior to this case had been unsettled and uncertain and an exclusionary remedy was therefore inappropriate. In reaching its decision, the circuit court explained that it had been conclusively established that Rule 7—104(a)(1) applies in criminal prosecutions to government attorneys and to nonattorney government law enforcement officers when they act as the alter ego of the government prosecutor. The court held that the rule is not co-

extensive with the sixth amendment right to counsel and may apply prior to the bringing of judicial charges, but held that application of the rule should be limited so as not to hamper law enforcement officers in their efforts to develop evidence. The court held that the rule does not preclude undercover investigations, but that adequate safeguards must be imposed without crippling law enforcement. The court held that, under the rule, a prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization. The court recognized, however, that in some instances a prosecutor may overstep the broad powers of his office and in so doing violate the rule. In *Hammad,* the prosecutor did just this by issuing a subpoena for the informant, not to secure his attendance before the grand jury, but to create a pretense that might help the informant elicit admissions from the defendant. This made the informant the alter ego of the prosecutor and thereby violated the rule. The court specifically stated that, absent such misconduct, the use of informants by government prosecutors in a preindictment, noncustodial situation will generally fall within the "authorized by law" exception to the rule and therefore will not be subject to sanctions. Finally, the court held that suppression of the evidence may be ordered as a sanction for violation of the rule in the trial court's discretion.

■ From the foregoing Federal cases, we are able to glean the following:

(1) Rule 7—104(a)(1) applies to criminal as well as civil cases.

(2) The rule is not coextensive with the sixth amendment right to counsel, but may apply prior to the bringing of judicial charges.

(3) The rule applies to government prosecutors and to government investigators or informants when they act as the alter ego of the prosecutor.

(4) Government investigators and informants act as the alter ego of the prosecutor when they act at the behest of and with specific instructions from that prosecutor to elicit incriminating statements from the defendant. Merely instructing an informant to induce the defendant to talk is not sufficient to constitute the informant the alter ego of the prosecutor. However, where the prosecutor instructs the informant how to elicit incriminating statements by telling him what to say or ask, the informant may be considered the alter ego of the prosecutor.

(5) When not acting as the alter ego of the prosecutor, government investigators may engage in legitimate investigative techniques, including the use of an informant to eavesdrop upon and tape-record a conversation with the defendant.

In the appeal before us, defendant argues that Rule 7—104(a)(1) should be held by us to apply to criminal cases and to government prosecutors and government investigators and informants who act as the alter ego of the prosecutor, that the rule should not be held to be coextensive with the sixth amendment, but should be held by us to apply prior to the filing of formal charges, and that we should find that Detectives Spaul and Tune as well as Craig White were all acting as the alter egos of the prosecutor. Specifically, defendant argues that mere knowledge on the part of the prosecutor of the officers' plan to conduct an eavesdrop is sufficient to constitute those officers the alter egos of the prosecutor, and that Craig acted as the alter ego of the prosecutor because his actions were designed to elicit incriminating statements from the defendant. Finally, defendant asks us to find a violation of Rule 7—104(a)(1), to find that that violation required suppression of the tape-recorded statement, and to reverse his conviction and order a new trial because of the trial court's refusal to grant his supplemental motion to suppress.

The State agrees with defendant that Rule 7—104(a)(1) applies to criminal as well as civil cases. Here, however, the agreement ends. The State argues that the rule should be held to be coextensive with the sixth amendment right to counsel because to afford the protection of the rule to criminal suspects prior to the filing of charges would unduly hamper law enforcement's efforts to solve crime. The State argues that if we hold otherwise, criminal suspects may insulate themselves from legitimate investigative techniques simply by retaining counsel immediately after the commission of a crime.

 We are cognizant that, in deciding this issue, a careful balance must be struck between the competing interests of the criminal suspect and law enforcement agencies. We are not convinced that the balance can only properly be struck by holding that Rule 7—104(a)(1) is coextensive with the sixth amendment right to counsel. As pointed out in *Hammad*, to so hold would effectively make the rule superfluous. We agree with the court in *Hammad* that Rule 7—104(a)(1) and the sixth amendment right to counsel serve separate though congruent purposes. Thus, in finding the proper balance between these important interests, it is useful to understand the purpose behind Rule 7—104(a)(1).

■■■ As explained in *Massiah v. United States* (1964), 377 U.S. 201, 211, 12 L. Ed. 2d 246, 253, 84 S. Ct. 1199, 1205 (White, J., dissenting, joined by Clark and Harlan, JJ.), American Bar Association Rule 7—104(a)(1) is designed to protect a party from the superior legal skill and acumen of the opponent's attorney. In the context of a criminal case, the rule serves to protect a defendant from the danger of being tricked into giving his case away by the prosecutor's artfully crafted question. (*United States v. Jamil* (2d Cir. 1983), 707 F.2d 638, 646.) It is this purpose then which must be balanced against the interest of law enforcement agencies in fully investigating crimes and developing evidence necessary to a successful prosecution.

■■■ In our opinion, the proper balance is not achieved by holding that the rule is coextensive with the sixth amendment, for such a balance weighs too heavily in favor of law enforcement. Instead, we believe that the proper balance was achieved in *Hammad,* which held that the disciplinary rule applied prior to the filing of formal charges, but that the rule was only violated when the attorney/prosecutor was intimately involved in the investigation. Such a rule of law adequately protects the criminal suspect from the superior legal skill of the prosecutor while allowing government investigators to employ legitimate investigative techniques to solve crimes and develop evidence necessary for a successful prosecution. Thus, we hold that Rule 7—104(a)(1) of the Illinois Code of Professional Responsibility is not coextensive with the sixth amendment, but provides protection to a criminal suspect even prior to the filing of formal charges.

■■■ Defendant next argues that the prosecutor was sufficiently involved in the eavesdrop operation here that Detectives Tune and Spaul were acting as his alter egos, thereby violating the rule. The only evidence of the prosecutor's involvement in the eavesdrop operation here is that he was aware of the operation in that an assistant State's Attorney authorized Detective Tune to petition the court for an order authorizing the eavesdrop. Defendant argues that the prosecutor's mere knowledge of the operation is sufficient. We do not agree. Again considering the purpose behind Rule 7—104(a)(1), we do not think that the prosecutor's mere knowledge of an investigative procedure is sufficient to constitute the investigator the alter ego of the prosecutor because that mere knowledge does not present the danger that defendant will be subjected to the prosecutor's superior legal skill and acumen. There is no evidence in the instant case that Detectives Tune and Spaul were acting as the alter egos of the prosecutor and the rule was not violated by their actions.

 Defendant further argues that Craig White was acting as the alter ego of the prosecutor because his actions were designed to elicit incriminating statements from defendant. Again, we find no evidence that Craig was acting as the alter ego of the prosecutor. There is no evidence that Craig was instructed what to say to defendant, or what to ask him, or even that Craig was instructed to elicit incriminating statements from defendant. Further, it appears from the record that Craig's actions were only designed to induce defendant to discuss the crime, but not to elicit any specific information or admission. The rule was not violated by the actions of Craig White.

Finally, in light of our finding that the rule was not violated, we need not discuss the State's argument that, because the eavesdrop was judicially approved, the contact with defendant was "authorized by law" within the meaning of Rule 7—104(a)(1).

Defendant's next argument relates to the denial of his motion to suppress the recorded conversations between him and Craig for the reason that the petition seeking the order authorizing the eavesdrop was factually deficient. Defendant's motion argued that the petition failed to allege sufficient facts to show reasonable cause to believe that defendant had committed a felony or that conversations concerning the felony would be obtained through use of the eavesdropping device, as required by section 108A—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 108A—4). The motion further argued that the facts alleged in the petition were hearsay, incredible and uncorroborated. Therefore, the motion argued, the court erred in granting the petition for order authorizing the eavesdrop. On appeal, defendant repeats these arguments and further argues that the trial court erred in denying his motion to suppress the recorded conversations.

 Section 108A—4 of the Code of Criminal Procedure of 1963 provides that a judge may authorize the use of an eavesdropping device when he finds that one party to the conversation has consented to the use of the device, there is reasonable cause for believing that an individual is committing, has committed or is about to commit a felony, and there is reasonable cause to believe that particular conversations concerning the felony will be obtained through use of the eavesdropping device. (Ill. Rev. Stat. 1989, ch. 38, par. 108A—4.) The term "reasonable cause" as used in the statute has been held to be synonymous with the term "probable cause" and is established when the totality of facts and circumstances existing at the time are sufficient to warrant the belief by a man of reasonable conscience that an offense has been, is being or will be committed. (*People v. Hammer*

(1984), 128 Ill. App. 3d 735, 737-38, 471 N.E.2d 615, 618.) Unlike situations involving search warrants, in determining the existence of reasonable cause courts should not be unduly technical. (*Hammer*, 128 Ill. App. 3d at 737, 471 N.E.2d at 618.) The application for an eavesdropping order should be viewed in a commonsense fashion, and neither proof beyond a reasonable doubt that a crime has been committed nor even a *prima facie* case need be established. (*People v. Stewart* (1987), 161 Ill. App. 3d 99, 105, 514 N.E.2d 51, 55.) Only a probability of criminal activity need be shown. (*Stewart*, 161 Ill. App. 3d at 105, 514 N.E.2d at 55.) The issuing judge's conclusions regarding the existence of reasonable cause are to be accorded great deference by subsequent judges reviewing his actions. (*Stewart*, 161 Ill. App. 3d at 105, 514 N.E.2d at 55.) Assessment of witness credibility is for the trial court. *People v. Hammer* (1984), 128 Ill. App. 3d 735, 740, 471 N.E.2d 615, 620.

Defendant first argues that the petition was deficient in that it does not allege sufficient facts upon which to base a finding of probable cause to believe defendant had committed a felony. Defendant argues that the petition contains two inconsistent statements made by Craig about the offense, that Craig's statement implicating defendant was not corroborated in any way, and that the petition contains no facts upon which the court could base a finding as to Craig's veracity or reliability. Defendant argues that Craig's veracity and reliability are not established by his having made a statement against penal interest where he was already implicated in the crime and his statement implicating defendant tended to lessen Craig's involvement in the crime and shift the blame to defendant.

We agree with defendant that the general rule that statements against penal interest carry their own indicia of credibility should not be applied automatically but should be viewed in the light of the individual informer. (See *People v. Horton* (1979), 74 Ill. App. 3d 293, 295, 392 N.E.2d 946, 948.) In the instant case, as in *Horton*, Craig's accusations against defendant, though self-incriminating, could be equally indicative of a self-serving motive since they tended to lessen his involvement in favor of defendant. The situation at bar is different from one in which an informant not otherwise incriminated makes a self-incriminating admission while also accusing another. In the instant case, Craig had already implicated himself through his statement to Lynn Hollowich. Thus, his accusations against defendant, while implicating Craig in the crime of concealment of a homicidal death, served to exonerate Craig of the homicides. In such a case,

the statement against penal interest carries less indicia of credibility than it otherwise would.

However, we think that, considering the totality of the circumstances as alleged in the petition, Craig's statements were sufficiently reliable and credible for the trial court to find reasonable cause to believe defendant had committed a felony. The petition established that Craig did know certain facts about the crimes which he could not have known had he not been involved. He had told Lynn Hollowich that Pieper's body had been placed in the shale pit months before the body was discovered there. Where part of an informant's story is verified, the corroboration lends credence to the remaining unverified part. *People v. James* (1987), 118 Ill. 2d 214, 225, 514 N.E.2d 998, 1003.

Furthermore, Craig was implicating his older brother and consented to be involved in the eavesdrop. Finally, there is no indication that Craig was promised leniency or offered anything in return for his accusations against defendant, or in return for his agreement to be involved in the eavesdrop. In *People v. James* (1987), 118 Ill. 2d 214, 224, 514 N.E.2d 998, 1002, it was explained that where an informant is implicated in the offense and is not offered any "deal" in return for information·implicating another, he has nothing to gain by providing false information about the other for, once the falsehood is discovered, he would have to suffer the consequences of misleading the police. As the court there explained, one who knows the police are in a position to charge him with a serious crime is not likely to direct the police down a blind alley. 118 Ill. 2d at 224, 514 N.E.2d at 1002.

It must be remembered that the danger of fabrication is less in a probable cause setting than at the trial stage and that courts have been most willing to find a sufficient showing of veracity in the probable cause setting. (*James*, 118 Ill. 2d at 224-25, 514 N.E.2d at 1003.) We think that Craig's statements were sufficiently credible and reliable to furnish the court with probable cause to believe defendant had committed a felony sufficient to justify issuance of an order authorizing use of an eavesdropping device.

Defendant also argues that the petition does not contain sufficient facts from which the trial court could have found probable cause to believe that particular conversations concerning the felony offense would be obtained through use of the eavesdropping device. Defendant argues that the petition alleges only one conversation about the offense between Craig and defendant, which occurred on December 22, 1987, some nine months prior to the date of the petition. There is

no indication in the petition that defendant and Craig ever again discussed the crimes.

The State points out that Craig and the defendant were brothers and knew each other well. Defendant had admitted the crimes to Craig once, and Craig had even helped defendant to cover up the crimes. Further, the petition alleges that Craig had agreed to discuss the crimes with defendant, implying Craig's belief that defendant would discuss the crimes with him.

■■■ We think there was sufficient evidence for the trial court to find probable cause to believe defendant would discuss the crimes with Craig. The time between the previous discussion and the eavesdrop is not important, for guilty knowledge is not usually dissipated by time. (*People v. Stewart* (1987), 161 Ill. App. 3d 99, 107, 514 N.E.2d 51, 56.) In light of the boys' relationship and the circumstances surrounding their previous discussion, we think there was probable cause to believe defendant would again discuss the crimes with Craig.

We think the petition for order authorizing use of an eavesdropping device was sufficient. The trial court did not err in denying defendant's motion to suppress the recorded conversations.

The final issue we will address is defendant's argument that the trial court erred in denying his motion for an evidentiary hearing to inquire into intentional or reckless omissions of material facts from the petition for order authorizing use of an eavesdropping device. Defendant argues that Detective Tune recklessly or intentionally omitted from the petition the substance of Craig's recorded telephone conversations with Lynn Hollowich in which Craig admitted killing Pieper and denied that defendant was involved, the substance of the police interview with Craig of September 10, 1988, in which Craig stated that defendant killed both Adella and Pieper and disposed of Pieper's body alone, and the fact that the results of Craig's polygraph examination indicated that he was involved in the murders. Defendant argues that if these material facts had been included in the petition, they would have shown that there was no probable cause upon which to base the order authorizing the eavesdrop.

Although defendant seeks an evidentiary hearing similar to that provided in *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, he premises his argument not on the fourth amendment to the United States Constitution, but upon principles of fundamental fairness and due process.

■■■ In *Franks v. Delaware*, the United States Supreme Court held that in the context of an application for a search warrant, if a

defendant makes a substantial preliminary showing that a false statement was knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the fourth amendment requires that an evidentiary hearing be held at the defendant's request. If at the hearing the allegation of perjury or reckless disregard is established by a preponderance of the evidence and, after the false material is set aside, the remaining content of the affidavit is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded. If, however, despite defendant's substantial showing of perjury or reckless disregard, the affidavit establishes probable cause even in the absence of the allegedly false material, no evidentiary hearing is required.

The *Franks* rule is based on the fourth amendment, which requires that search warrants shall issue only upon probable cause supported by oath or affirmation. The court pointed out that there is a presumption of validity with respect to the warrant affidavit and defendant must present allegations of deliberate falsehood or of reckless disregard for the truth accompanied by an offer of proof. Allegations of negligence or innocent mistake are insufficient.

In *People v. Stewart* (1984), 105 Ill. 2d 22, 43, 473 N.E.2d 840, 850, our supreme court extended the *Franks* rule to include not only false statements included in the search warrant affidavit, but also omissions of material fact made in an effort to deceive the issuing judge. The defendant must show that the information omitted was material to the determination of probable cause and that it was omitted for the purpose of misleading the judge. (105 Ill. 2d at 43, 473 N.E.2d at 851.) Again, this rule is based upon the fourth amendment.

Conceding that neither *Franks* nor the fourth amendment applies to a consensual eavesdrop (*People v. O'Dell* (1980), 84 Ill. App. 3d 359, 366, 405 N.E.2d 809, 815), defendant asks us to establish a rule similar to that established in *Franks*, applicable to consensual eavesdrops, but based upon principles of fundamental fairness and due process. He argues that an order authorizing an eavesdrop which is based upon knowing or reckless perjury is contrary to " 'the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' [citation], and which reflect 'the community's sense of fair play and decency' [citation]". *People v. Cornille* (1983), 95 Ill. 2d 497, 508, 448 N.E.2d 857, 863.

The State argues that defendant has waived this argument by his failure to raise it before the trial court. The State is cor-

rect that defendant did not argue before the trial court that he was entitled to an evidentiary hearing based on principles of fundamental fairness and due process. The State is also correct that issues or arguments not raised before the trial court are deemed waived for purposes of review. (*People v. Adams* (1989), 131 Ill. 2d 387, 395, 546 N.E.2d 561, 564.) Defendant responds, however, that the waiver rule is not absolute and that errors involving fundamental fairness or affecting substantial rights will be reviewed despite defendant's failure to raise them before the trial court. (107 Ill. 2d R. 615(a).) Defendant argues that because his argument before us is based on principles of due process we should review it. We do not agree with defendant that simply basing an appellate argument on a claimed constitutional violation is sufficient to constitute it a "plain error" within the meaning of Rule 615(a). However, in the instant case we will consider defendant's argument because of the particularly damning nature of the recorded conversations and the seriousness of the offenses.

We find it unnecessary to establish new law permitting a *Franks*-like hearing in the context of an application for order authorizing use of an eavesdropping device because we find that, even if such a hearing were held in the instant case, defendant would not be entitled to suppression of the recorded conversations. We find that even upon consideration of the omitted materials, reasonable cause was still established to authorize the eavesdrop. The omitted material consists of the following:

> (1) the results of Craig's polygraph examination, given September 10, 1988, indicating that Craig was involved in the murders and the concealment, and that he was lying when he stated he knew nothing about them;

> (2) an interview with the police on September 10, 1988, in which Craig stated that he had nothing to do with the murders or concealment, but only learned of them when defendant admitted committing the crimes;

> (3) the substance of the eavesdropped conversations between Craig and Lynn Hollowich in which Craig admitted that he had killed Pieper and disposed of his body in the shale pit and adamantly denied that defendant had anything to do with the crimes. Craig insisted that he was telling Lynn the truth.

Defendant argues that these omitted facts exculpate the defendant and inculpate Craig and that they highlight the inconsistencies in Craig's statements and therefore impeach his credibility as to the statements included in the petition for order authorizing use of an eavesdropping device.

We do not think that the trial court's finding as to reasonable cause would have been any different even had it been made aware of these omitted facts. The trial court was already aware that Craig had made conflicting statements regarding his involvement in the crimes. The petition alleges that Craig had told Lynn Hollowich that he killed Pieper and threw his body into the shale pit, but that Craig had told the police that defendant had killed Pieper and Adella and that Craig only helped defendant dispose of Pieper's body. That the omitted materials may have tended to exculpate defendant while inculpating Craig would not have influenced the trial court's determination as the statements included in the petition have the same effect. We do not believe that inclusion of the omitted materials would have precluded a finding of reasonable cause to authorize the eavesdrop. The trial court did not, therefore, err in denying defendant's motion for evidentiary hearing.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

HARRISON and LEWIS, JJ., concur.