No. 2--06--0096      Filed: 3-5-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--260 |
| ALAN J. LARSON, | ) ) | Honorable Gerald F. Grubb, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the opinion of the court:

In December 2005, a jury found defendant, Alan J. Larson, guilty of committing the offenses of aggravated cruelty to an animal (510 ILCS 70/3.02 (West 2004)) and possession of a firearm without a firearm owner's identification (FOID) card (430 ILCS 65/2(a)(1) (West 2004)). Following the trial court's denial of defendant's motion for a new trial, the trial court imposed a sentence of 12 months' probation. Defendant appeals, presenting three issues for our review: (1) whether his conviction of aggravated cruelty to an animal must be reversed because the statute defining the offense is unconstitutionally vague; (2) whether the State proved him guilty beyond a reasonable doubt of the offense of aggravated cruelty to an animal; and (3) whether the State proved him guilty beyond a reasonable doubt of the offense of possession of a firearm without a FOID card. We affirm.

On October 12, 2004, defendant was charged with committing the offenses of aggravated cruelty to an animal and possession of a firearm without a FOID card, stemming from an incident on

October 10, 2004, where defendant shot the family dog. On March 1, 2005, defendant filed a motion to declare the aggravated-cruelty-to-an-animal statute unconstitutional. Defendant argued, inter alia, that the statute was void for vagueness and that it provided inadequate notice for compliance. Following argument of the parties, the trial court found the statute constitutional and denied defendant's motion.

The case proceeded to trial on December 6, 2005. Linda Larson, defendant's wife, testified that she and defendant had been married for 16 years. They had three children, Olle, John, and Tracey, who were 15, 14, and 13 years of age, respectively. Linda testified that defendant had been unemployed for approximately three years.

Linda testified that, in 2002, the family had a pet dog, a German shepherd. Linda testified that the dog had a skin disease, and they ultimately had to take the dog to the veterinarian to be euthanized. In March 2003, the family fostered and then adopted a pet dog, a Rhodesian ridgeback named Sinai, from Kathy Bakken. Linda testified that the family had no problems with Sinai. Linda testified that Sinai was initially shy around the family for a couple of weeks, but then became integrated with the family. Linda testified that Sinai never displayed any aggressive tendencies toward anyone and never bit anyone.

Linda further testified that, in November 2003, her father moved in with the family for approximately six months. Linda testified that her father suffered from dementia and that she was his guardian. Linda testified that her father got along very well with Sinai and that Sinai was never violent or aggressive toward him.

Linda testified that the family decided that Sinai needed a playmate, and they later adopted another dog, named Sheba. Linda testified that Sinai and Sheba got along with each other and that Sinai never displayed any aggressive behavior toward Sheba.

Linda testified that, on October 10, 2004, defendant drove her to work. At approximately 3:30 p.m. that day, defendant picked her up from work, and they went to a store in Rockford. Linda testified that, on their way to the store, defendant told her "there's going to be one less dog" when she got home. Linda testified that she said to defendant, "you didn't kill Sinai," and defendant replied that he had. Linda testified that defendant said "they had a hole and they dragged him to the hole." Linda testified that she was very upset and crying, but defendant was calm and normal. Linda testified that she went into the store, where she called a friend from work and told her that defendant had shot Sinai with a gun.

Linda further testified that they then went to Target, and she went in by herself. Linda testified that, when she came out of Target, their vehicle was surrounded by police squad cars. Linda testified that she spoke with Boone County Detective Jerry Ashens on her cell phone. Linda testified that defendant was transported to the Boone County police department, and she returned home. Linda testified that their children were home when defendant shot the dog.

Linda testified that Sinai "loved everybody," but that, in the two weeks before the shooting, Sinai was protecting her more and barking at defendant. Linda testified that, during those two weeks, she and defendant had begun dissolution proceedings. Linda testified that defendant had threatened to kill Sinai but that she did not believe that he would do so.

Linda testified that, on October 11, 2004, the police came to the house and took all of defendant's firearms. Linda testified that the firearms had always been kept hidden in the basement,

but, when the police came to the house, the firearms were found in the trunk of their car in their driveway.

Jerry Ashens from the Boone County sheriff's department testified that, on October 10, 2004, he was dispatched to the Larson residence for a welfare check. Ashens testified that the dispatcher told him that Linda had received information that defendant was going to do harm to one of the family pets, and her employer was concerned about her well-being. Ashens testified that he went to the Larson residence and spoke with the son Olle. Ashens testified that Olle telephoned his parents, and Ashens then spoke with Linda, who told Ashens that she was upset because defendant had shot and killed Sinai. Ashens testified that he subsequently spoke with defendant, who admitted to shooting the dog with his .45-caliber handgun. Defendant told Ashens that he shot the dog at least three times and that he shot the dog because it had been growling and barking at him. Ashens testified that defendant told him that he buried the dog.

Ashens further testified that he asked defendant whether he had a FOID card, and defendant replied he did but that it had expired in 2002. Ashens testified that the police subsequently seized defendant's weapons from the trunk of his vehicle, and one of the weapons seized was a .45-caliber handgun. Ashens identified defendant's FOID card in evidence, which reflected an expiration date of January 1, 2002.

Kathy Bakken, the regional coordinator for the Midwest region of the Rhodesian Ridgeback Rescue, testified that, prior to the Larsons' fostering and adopting Sinai, she fostered Sinai for approximately four months. Bakken testified that Sinai was submissive to all of her other dogs and did not exhibit aggression. Bakken testified that, in May 2003, when she turned Sinai over to the Larsons, she told them that they could return Sinai to her if for any reason Sinai did not work out

with them. Bakken testified that the Larsons never advised her of any problems with Sinai. Bakken testified that she assisted the Larsons in adopting Sheba in September 2003.

Bakken further testified that, on October 11, 2004, she was notified of the incident involving Sinai. Bakken testified that, on October 12, 2004, she traveled to the Larson residence and reclaimed Sheba. Bakken testified that she asked defendant where Sinai was and defendant replied that he had shot Sinai. Bakken testified that defendant's demeanor seemed very calm and conversational.

The State rested, and Olle Larson, defendant's father, testified on behalf of defendant. Olle Larson testified that, on August 28, 2004, he was at the Larson residence for a birthday party, and Sinai bit him on the leg. Olle Larson testified that the incident startled him but the bite did not pierce his skin and there was no bruising.

Defendant's son Olle testified that, approximately three months after Sinai came to live with them, the dog bit him on his nose and hand. Olle testified that he told his mother about the bites but that she did not do anything about it. Olle testified that he observed Sinai bite defendant numerous times. Olle testified that Sinai was friendly toward women and unfriendly toward men. Olle testified that Sinai acted aggressively toward visitors. Olle testified that Sinai became more aggressive after the family adopted Sheba.

Olle further testified that, on October 10, 2004, defendant left the house to pick up Linda, and, approximately two hours later, the police arrived at the house. Olle testified that he told the police that his parents might be having a dispute because the dog was gone and that "dad got rid of the dog." Olle testified that he told the police it was possible that a gun was involved.

On cross-examination, Olle admitted that he did not receive medical treatment for the dog bites he received. Olle testified that Sinai was already gone on October 10, 2004, when the police arrived, and he denied seeing what happened to Sinai.

Defendant's son John testified that Sinai did not like him, his brother, or his dad. John testified that, sometime in October 2004, Sinai bit him in the face. John testified that Sinai also bit his brother, defendant, and a Scouting friend. John testified that he was afraid of the dog. John testified that, on October 10, 2004, he was on a Scouting trip with his brother. He testified that, when they returned home, Sinai was gone and he did not know what happened to the dog.

Defendant's daughter, Tracey, testified that Sinai was a good dog at first. Tracey testified that, after Sinai became comfortable, he began tearing up her parents' pillows and bed sheets. Tracey testified that Sinai liked women but hated men. Tracey testified that she observed Sinai and Sheba fight. She also testified that she observed Sinai bite her grandfather Olle, her aunt Kim, one of her brothers, and a few of her brothers' friends. Tracey testified that Sinai barked constantly, even after she went to bed. Tracey testified that Sinai never bit her but she was afraid of Sinai. Tracey testified that she had not seen Sinai since October 10, 2004, and did not see what happened to the dog. Tracey testified that she was relieved that the dog was gone. On cross-examination, Tracey admitted that she had a strained relationship with her mother.

Defendant testified that he had been in the Army from 1977 to 1988, having left the military with the rank of captain. Defendant testified that he had been unemployed since January 2002. In 2003 he and Linda were preparing to file for bankruptcy because they were approximately $110,000 in debt. Defendant testified that they had incurred approximately $3,000 in veterinarian bills for their previous dog, the German shepherd. Defendant testified that in December 2002 he and his father

took the German shepherd to a veterinarian's office to be euthanized, and he was charged $75 for the services.

Defendant testified that he recalled agreeing "under duress" to adopt Sinai and recalled signing a contract to adopt Sinai. Defendant testified that Sinai eventually took over the house and became aggressive. Defendant testified that Sinai became even more aggressive after they adopted Sheba. Defendant testified that Sinai bit him on both ankles and his buttocks; the bites were painful but did not break the skin. Defendant further testified that, a few days before October 10, 2004, at approximately midnight or 1 a.m., Sinai attacked him on his way to use the bathroom, and Sinai chased him into his sons' bedroom. Defendant testified that he stayed in his sons' bedroom the rest of the night. Defendant testified that he never beat or mistreated Sinai.

Defendant testified that, on October 10, 2004, he took Linda to work. Defendant testified that, when he returned home, Sinai growled, bared its teeth at him, and appeared aggressive. Defendant testified that, "[a]fter having received counsel" from two ministers and five psychologists, he collared and leashed Sinai and took him outside, approximately one-half mile from the house. Defendant testified that he took a magazine, seven rounds of ammunition, and his Colt .45 pistol and shot the dog in the head three times. Defendant testified that the dog died but did not seem to suffer.

Defendant testified that he did not take Sinai to the veterinarian because he did not have the money to euthanize the dog. Defendant testified that he asked Linda to return Sinai but that she would not agree to it. Defendant testified that he believed it was economically and spiritually necessary to do what he did.

On cross-examination, defendant admitted that Sinai had no medical problems other than some allergies that required special food. Defendant could not recall whether Bakken offered to take

back Sinai. Defendant admitted that he contacted Bakken about problems with Sheba but not Sinai. Defendant also admitted that the ministers he spoke with never told him that he should shoot the dog. Defendant admitted that Sinai did not bite or attack anyone on October 10, 2004.

Joseph Frost II, a veterinarian from Belvidere, testified that the Department of Agriculture adopted the American Veterinary Medical Association panel's report on euthanasia. Frost testified that the report on euthanasia reflected that, under the proper circumstances, the use of a gunshot to the brain was a conditionally acceptable method of euthanizing an animal. On cross-examination, Frost agreed that the use of an accurately delivered gunshot was recommended as the method of last resort, that is, when other methods could not be used. Frost also agreed that the report stated that personnel performing physical methods of euthanasia must be well trained and monitored for each type of physical technique performed.

The defense rested, and the State called its rebuttal witnesses. Linda testified that Sinai never destroyed any furniture or woodwork in the house, but, when the family adopted Sheba, the dogs would run through the house and ricochet off a bed, damaging blankets or pillows. Linda testified that she never observed Sinai bite defendant or the children and that neither defendant nor the children ever told her that Sinai had bitten them. Linda testified that defendant's only complaint about Sinai was the barking. Linda testified that defendant never asked her to return Sinai to the Rhodesian Ridgeback Rescue operation.

Bakken testified that, when she turned Sinai over to the Larsons, she told them that, if they could not keep Sinai, they needed to return Sinai and she would keep him. Bakken also testified that defendant did not appear to be under any sort of duress when he signed the contract to adopt Sinai.

Bakken added that, during the time she fostered Sinai, the dog never displayed any aggressive tendencies toward her husband or other men.

Following the State's rebuttal, the parties presented their closing arguments, and the trial court instructed the jury. The jury found defendant guilty of both charges, and the trial court entered its judgment on the verdict.

Defendant filed a motion for a new trial, and on January 24, 2006, the trial court conducted a hearing. Following arguments, the trial court denied defendant's motion. The case proceeded to sentencing, where the trial court imposed a sentence of 12 months' probation. Defendant filed a timely notice of appeal.

Defendant first contends that his conviction must be reversed because the aggravated-cruelty-to-an-animal statute is unconstitutionally vague. The statute, which is section 3.02 of the Humane Care for Animals Act (the Act) (510 ILCS 70/3.02 (West 2004)), states:

"No person may intentionally commit an act that causes a companion animal to suffer serious injury or death. Aggravated cruelty does not include euthanasia of a companion animal through recognized methods approved by the Department of Agriculture.

A person convicted of violating Section 3.02 is guilty of a Class 4 felony." 510 ILCS 70/3.02 (West 2004).

Specifically, defendant argues that a reasonable person cannot determine from the statute what acts or methods are permissible means to euthanize one's own companion animal. Defendant argues that the statute fails to define "euthanasia" and "recognized methods approved by the Department of Agriculture." Defendant also argues that section 3.02 of the Act is an abrogation of his common-law property right to dispose of his property and that, therefore, the statute must be strictly construed.

Defendant concludes that the statute is incapable of any valid application because it provides no standard of conduct at all.

A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity. People v. Boand, 362 Ill. App. 3d 106, 138-39 (2005), citing People v. Malchow, 193 Ill. 2d 413, 418 (2000). Reviewing courts have a duty to construe the statute in a manner that upholds its constitutionality if it can be done reasonably, and any doubt must be resolved in favor of the statute's validity. Boand, 362 Ill. App. 3d at 139, citing Malchow, 193 Ill. 2d at 418. The fundamental principle of statutory construction is to ascertain and give effect to the legislature's intent. People v. Pierce, 226 Ill. 2d 470, 475-76 (2007), citing People v. Pack, 224 Ill. 2d 144, 147 (2007). The language of the statute is the best indication of the legislature's intent, and it should be given its plain and ordinary meaning. Pierce, 226 Ill. 2d at 476, citing Pack, 224 Ill. 2d at 147. Where the language of the statute is clear and unambiguous, we must apply it as written, without resort to extrinsic aids of statutory construction. People v. Collins, 214 Ill. 2d 206, 214 (2005). We further note that the traditional canons or maxims of statutory construction are not rules of law, but rather are "merely aids in determining legislative intent and must yield to such intent." In re Application of the County Treasurer, 214 Ill. 2d 253, 259 (2005). The constitutionality of a statute is a question of law, subject to de novo review. Boand, 362 Ill. App. 3d at 139, citing People v. Carney, 196 Ill. 2d 518, 526 (2001).

A statute is void for vagueness only if it fails to (1) "provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited," or (2) "provide explicit standards for those who apply it, thus authorizing or even encouraging arbitrary and discriminatory enforcement." People v. Law, 202 Ill. 2d 578, 582-83 (2002). Whether a statute is

void for vagueness must be determined in the factual context of each case. People v. Falbe, 189 Ill. 2d 635, 639 (2000). The tests for assessing whether a law is vague are not capable of mechanistic application. City of Chicago v. Pooh Bah Enterprises, Inc., 224 Ill. 2d 390, 443 (2006). In any context, though, "there are limits to the degree of precision attainable by the English language." City of Chicago, 224 Ill. 2d at 444. In Ward v. Rock Against Racism, 491 U.S. 781, 105 L. Ed. 2d 661, 109 S. Ct. 2746 (1989), the United States Supreme Court recognized that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Ward, 491 U.S. at 794, 105 L. Ed. 2d at 677, 109 S. Ct. at 2755. Moreover, "when judging the constitutionality of a rule or statute, common sense cannot and should not be suspended." City of Chicago, 224 Ill. 2d at 444, citing Anderson v. Milwaukee County, 433 F.3d 975, 978 (7th Cir. 2006).

The aggravated-cruelty-to-an-animal statute must satisfy two requirements to comport with the standards of due process. First, the statute's prohibitions must be sufficiently definite, when measured by common understanding and practices, to inform a person of ordinary intelligence what conduct is lawful and what conduct is unlawful. People v. Izzo, 195 Ill. 2d 109, 113 (2001). Second, the statute must provide "sufficiently definite standards for law enforcement officers and triers of fact such that its application does not depend merely on their private conceptions." Izzo, 195 Ill. 2d at 113. So long as a defendant's conduct clearly falls within the statutory proscription, a defendant may be prosecuted under the statute in harmony with due process, even though the statute may be vague as to other conduct. Izzo, 195 Ill. 2d at 113, citing People v. Anderson, 148 Ill. 2d 15, 28 (1992).

Defendant is correct that, in the eyes of common law, a pet "is an item of personal property." Jankoski v. Preiser Animal Hospital, Ltd., 157 Ill. App. 3d 818, 820 (1987); see also Sentell v. New Orleans & Carrollton R.R. Co., 166 U.S. 698, 700, 41 L. Ed. 1169, 1170, 17 S. Ct. 693, 694 (1897)

("[b]y the common law, as well as by the law of most, if not all, the States, dogs are so far recognized as property"). This view of a pet as an item of personal property still prevails in many jurisdictions, although it is deemed outdated by animal-law scholars. See M. Livingston, The Calculus of Animal Valuation: Crafting a Viable Remedy, 82 Neb. L. Rev. 783, 787-803 (2004); see also R. Miller, Annotation, Damages for Killing or Injuring Dog, 61 A.L.R. 5th 635 (1998). However, a reviewing court will not engage in statutory construction if the statutory language is unambiguous. See Collins, 214 Ill. 2d at 214 (where the language of the statute is clear and unambiguous, it will be applied as written, without resort to extrinsic aids of statutory construction). Therefore, in the event we find no ambiguity in the statutory language, the maxim of strict construction will have no application. See People v. Perry, 224 Ill. 2d 312, 333 (2007).

In the present case, we determine that the aggravated-cruelty-to-an-animal statute is not vague. We recognize that criminal acts cannot always be defined with absolute precision. City of Chicago v. Powell, 315 Ill. App. 3d 1136, 1147 (2000), citing People v. Burpo, 164 Ill. 2d 261 (1995). Section 3.02 of the Act prohibits a defendant from intentionally engaging in a course of conduct that causes a companion animal to suffer death or serious injury. 510 ILCS 70/3.02 (West 2004). Although defendant argues that a reasonable person cannot determine from the statute what acts or methods are permissible means to euthanize one's own companion animal, we note first that the scope of punishable conduct is limited by the individual's specified intent to cause the companion animal to suffer serious injury or death. Second, although the legislature chose to frame in general terms the prohibited conduct as "an act" and the prohibited result as causing a companion animal to suffer serious injury or death, it is well settled that " '[i]mpossible standards of specificity *** are not required.' " People v. Parkins, 77 Ill. 2d 253, 256 (1979), quoting People v. Schwartz, 64 Ill. 2d 275,

280 (1976). Consequently, we determine that application of the ordinary and popular meaning of the statutory language and recognition of the evil the statute intends to prevent, i.e., the intentional killing or injuring of companion animals, provides adequate notice of prohibited conduct and prevents arbitrary enforcement. See Parkins, 77 Ill. 2d at 257. We believe that a person of ordinary intelligence would reasonably know that, absent an affirmative defense, she or he may not simply grab a firearm, take the family dog outside, and shoot the dog in the head three times so as to kill it. We, therefore, conclude that the aggravated-cruelty statute is not unconstitutionally vague on its face.

Defendant apparently takes issue with the second sentence of the statute, which sets out what conduct does not constitute aggravated cruelty, that is, "euthanasia of a companion animal through recognized methods approved by the Department of Agriculture." 510 ILCS 70/3.02 (West 2004). Defendant argues that the statute fails to define "euthanasia" and "recognized methods approved by the Department of Agriculture."

Many statutes and regulations are necessarily lengthy and replete with exceptions and conditions because they address diverse matters of considerable complexity. People v. Conlan, 189 Ill. 2d 286, 292 (2000). In the present case, the contested word and phrase are not particularly complex, difficult to understand, or open to interpretation. Section 2.09 of the Act defines the phrase "humanely euthanized" as "the painless administration of a lethal dose of an agent or method of euthanasia as prescribed in the Report of the American Veterinary Medical Association Panel on Euthanasia published in the Journal of the American Veterinary Medical Association, March 1, 2001 (or any successor version of that Report), that causes the painless death of an animal." 510 ILCS 70/2.09 (West 2004). The word "euthanize" is defined as "the act of inducing humane death in an animal." 2000 Report of the American Veterinary Medical Ass'n Panel on Euthanasia, 218 Journal

of the Am. Veterinary Med. Ass'n, No. 5, 672 (March 1, 2001). Our review of the aggravated-cruelty statute does not reveal inconsistent terminology or terms without definition or meaning that cannot be discerned from their context. In our context, it appears that "euthanasia" would refer to the painless or humane killing of a companion animal.

With respect to the phrase, the "recognized methods approved by the Department of Agriculture," this too is unambiguous. A statute's reference to another source or document may render the statute more laborious to follow, but it is not our role to rewrite the statute according to our preferences. See Conlan, 189 Ill. 2d at 292-93. The issue before us is whether the statute is comprehensible such that it provides fair notice of what is prohibited. Conlan, 189 Ill. 2d at 293. The reference to the recognized methods approved by the Department of Agriculture is an aid in understanding what methods of euthanasia the statute permits and not a hindrance to comprehension. Having thoroughly reviewed the aggravated-cruelty-to-an-animal statute, we find that it is comprehensible and that it does provide fair notice of what conduct is prohibited. We believe that anyone who earnestly attempts to understand the statute can fully comprehend its terms and phrases and, more important, understand what is prohibited. See Conlan, 189 Ill. 2d at 293.

In his reply brief, defendant presents various hypothetical situations in which, he argues, if an owner does not consider the animal a pet, the aggravated-cruelty-to-an-animal statute would not apply to the owner, and the owner could not then be charged with committing the offense of aggravated cruelty to an animal if the owner were to kill the animal. Our supreme court has held, however, that a statute is not unconstitutionally vague merely because one can imagine hypothetical situations in which the meaning of some terms might be called into question. Izzo, 195 Ill. 2d at 113. Again, the validity of the law must be judged in light of the particular facts of the present case. See

Falbe, 189 Ill. 2d at 639. The scenarios posited by defendant are not at issue here. Rather, the events giving rise to defendant's prosecution involve the intentional killing of Sinai, the family pet, using a .45-caliber handgun.

Defendant was charged with the specific unlawful act of intentionally shooting and killing the family dog with a .45-caliber handgun, a violation of the Act (510 ILCS 70/3.02 (West 2004)), and not with any vague conduct. Inasmuch as defendant is the party challenging the constitutionality of a statute, he bears the burden of clearly establishing the constitutional violation. See People v. Wright, 194 Ill. 2d 1, 24 (2000). Upon our review of the issue presented, we determine that defendant has failed to satisfy such burden.

Defendant's second contention is that the State failed to prove him guilty beyond a reasonable doubt of the offense of aggravated cruelty to an animal. When a challenge to the sufficiency of the evidence is presented on appeal, it is not the reviewing court's function to retry a defendant. People v. Evans, 209 Ill. 2d 194, 209 (2004). In assessing whether the evidence against a defendant was sufficient to prove guilt beyond a reasonable doubt, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) People v. Cooper, 194 Ill. 2d 419, 430-31 (2000), quoting Jackson v. Virginia, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979). This standard applies to appeals of all criminal convictions, whether the nature of the evidence presented is circumstantial or direct. Cooper, 194 Ill. 2d at 431. The State is not required to exclude every reasonable hypothesis of innocence (People v. Pintos, 133 Ill. 2d 286, 291 (1989)), and the jury need not be satisfied beyond a reasonable doubt of each link in the chain of circumstances (People v. McDonald, 168 Ill. 2d 420,

443 (1995)). Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. People v. Rush, 294 Ill. App. 3d 334, 337 (1998). Moreover, when the determination of a defendant's guilt or innocence depends upon the credibility of the witnesses and the weight to be given their testimony, it is for the trier of fact to resolve any conflicts in the evidence. Rush, 294 Ill. App. 3d at 337, citing People v. White, 209 Ill. App. 3d 844, 868 (1991). We, as a reviewing court, are not to substitute our own judgment for that of the jury. Cooper, 194 Ill. 2d at 431; Rush, 294 Ill. App. 3d at 337.

Here, defendant does not point to any particular element of the offense of which he was convicted and then claim that the State failed to present evidence sufficient to find him guilty beyond a reasonable doubt. Rather, defendant appears to focus his argument on the exception to the offense, that is, defendant argues that the evidence overwhelmingly established that he euthanized his own dog in accordance with the statute. Defendant argues that the evidence established that Sinai was a "psycho dog" that bit everyone but Linda. Defendant argues in his brief that he, as a reasonable and responsible parent and citizen, was concerned for his family's physical and emotional well-being, as well as his liability were the dog to hurt a member of the community. Defendant argues that a veterinarian's euthanization method was financially prohibitive and points to the veterinarian Frost's testimony where he agreed that an accurately delivered gunshot was an acceptable method of euthanasia.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant guilty of aggravated cruelty to an animal and rejected defendant's claim of euthanasia. The relevant evidence was undisputed by most accounts that, on October 10, 2004, defendant took Sinai outside and away from home and shot the dog three times using a .45-caliber

handgun, causing the death of Sinai. Defendant admitted as much to Linda, Ashens, and Bakken. From this evidence, a rational trier of fact could have concluded that defendant intentionally committed an act, i.e., using a .45-caliber handgun to shoot Sinai, that caused Sinai to suffer death, a violation of the aggravated-cruelty-to-an-animal statute.

Moreover, the jury was well aware of defendant's testimony in which he explained why he killed Sinai and why he chose to use one particular method instead of another. However, the jury was not required to believe it. See People v. Peterson, 306 Ill. App. 3d 1091, 1101 (1999). The jury heard Linda testify that Sinai never showed any aggressive tendencies or bit anyone and that the family even adopted another Rhodesian ridgeback. The jury heard Bakken testify that, when she turned Sinai over to the Larsons, she told them that they could return Sinai to her for any reason if Sinai did not work out with them. The jury also heard Frost testify that an accurately delivered gunshot was recommended as a last resort and that personnel performing physical methods of euthanasia must be well trained and monitored for each type of physical technique performed. The jury had the responsibility to determine the credibility of the witnesses and resolve conflicts in the evidence. See Rush, 294 Ill. App. 3d at 337, citing White, 209 Ill. App. 3d at 868. Having heard all of the witnesses' testimony, the jury was not required to believe that, on October 10, 2004, defendant had no means of dealing with Sinai's problems but to take a loaded firearm and shoot the dog.

Defendant argues in the alternative that the trial court erroneously refused to give the jury an instruction based on defendant's defense of necessity. We find defendant's argument waived for lack of development. See Official Reports Advance Sheet No. 12 (June 7, 2006), R. 341(h)(7), eff. September 1, 2006 ("argument" must contain "the contentions of the appellant and the reasons

therefor, with citation of the authorities and the pages of the record relied on," and "[p]oints not argued are waived").

We hold that a rational trier of fact could have concluded beyond a reasonable doubt that defendant was criminally culpable for shooting the family dog on October 11, 2004. Accordingly, we will not disturb the jury's verdict.

Defendant's third contention is that the State failed to prove him guilty beyond a reasonable doubt of the offense of possession of a firearm without a FOID card. Section 2(a)(1) of the Firearm Owners Identification Card Act (430 ILCS 65/2(a)(1) (West 2004)) provides that "[n]o person may acquire or possess any firearm within this State without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Department of State Police under the provisions of this Act." Defendant argues that he could not have been properly convicted because the evidence showed that he possessed a FOID card previously issued to him, although it was expired. Defendant concludes that, because the jury was not instructed on any issue of expiration or validity, his conviction must be reversed.

Defendant's argument seems to be that a rational jury could not have found him guilty because the statute itself does not require a valid FOID card, only one that has been previously issued. "It is the jury's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt." People v. Frieberg, 147 Ill. 2d 326, 359 (1992). "Jurors do not leave their common sense behind when they enter court." People v. Rollins, 108 Ill. App. 3d 480, 488 (1982). Again, when reviewing the sufficiency of the evidence supporting a criminal conviction, it is not the function of this court to retry the defendant. Evans, 209 Ill. 2d at 209. In the present case, Ashens identified defendant's

FOID card in evidence. The FOID card reflected that it had expired on January 1, 2002. From this evidence, a rational trier of fact could have concluded that the FOID card ceased to be a proper and effective card; otherwise, the purpose of displaying an expiration date would be rendered meaningless. When viewed in the light most favorable to the State, the evidence adduced at trial permitted a rational trier of fact to conclude that defendant knowingly possessed a firearm on October 10, 2004, without a FOID card. We therefore will not disturb the jury's verdict.

For the foregoing reasons, we affirm the judgment of the circuit court of Boone County.

Affirmed.

BYRNE, P.J., and CALLUM, J., concur.