2021 IL App (2d) 200187-U
No. 2-20-0187
Order filed November 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-1653 |
| | ) | |
| ROBERT T. BOATRIGHT, | ) | Honorable |
| | ) | David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction of domestic battery was supported by (1) the victim's testimony that defendant shoved her, causing her arm to break a window and sustain a laceration; and (2) corroborating evidence, such as (a) the neighbors' testimony that defendant was aggressive toward the victim while they in the neighbors' apartment and that the victim returned there later with a laceration on her arm; and (b) officers' observation of a broken window and blood spots in the apartment the victim shared with the defendant.

¶ 2    Defendant, Robert T. Boatright, argues that the evidence was insufficient to support his

conviction of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)).  He contends that the

conviction was "based on the testimony of a single, incredible witness," namely the victim, "who

was admittedly intoxicated to the point that she could not recall her 911 call." Defendant is incorrect that the victim's testimony was the only evidence supporting the conviction. Based on the victim's testimony and the corroborating evidence, we affirm defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was indicted on five counts, all of which arose from a single incident on August 19, 2019, involving defendant and M.W., his girlfriend. The counts charged as separate acts defendant's (1) striking M.W. about her body and (2) pushing her. Count I charged aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2018)), a Class 2 felony, alleging that the pushing caused great bodily harm, namely a laceration requiring stitches. The remaining counts charged domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2), (b) (West 2018)) as a Class 4 felony based on defendant's two prior convictions of domestic battery. Count II alleged that the pushing caused bodily harm, namely a laceration (720 ILCS 5/12-3.2(a)(1) (West 2018)), while count III alleged that the pushing was physical contact of an insulting or provoking nature (720 ILCS 5/12-3.2(a)(2) (West 2018)). Count IV alleged that the striking caused bodily harm, namely bruising (720 ILCS 5/12-3.2(a)(1) (West 2018)), while count V alleged that the striking was physical contact of an insulting or provoking nature (720 ILCS 5/12-3.2(a)(2) (West 2018)).

¶ 5     The State moved *in limine* to introduce, as substantive evidence, testimony concerning three other instances of domestic violence by defendant against M.W. The instances occurred in November 2016, June 2017, and September 2019. The third incident took place while this case was pending below. According to the motion, on November 6, 2016, defendant struck M.W. several times on the face and chest while the two were in a car. On June 2, 2017, defendant and M.W. were outside her residence when defendant pushed her, causing her to fall backward and lose her balance. She then ran into the residence and locked the door; defendant chased her and

pounded on the door. On September 16, 2019, defendant entered M.W.'s apartment—apparently through the window—and put his hands around her throat, causing her to feel short of breath. He then struck her multiple times, including strikes with an ashtray. He also threw her to the ground and kicked her multiple times. (The court had reduced defendant's bond in the present case on September 3, 2019. Defendant posted bond and was released from custody. However, the court revoked defendant's bail as a result of the September 16, 2019, incident.) The court granted the motion only as to the November 2016 and September 2019 incidents.

¶ 6    M.W. was the State's first witness at trial. She agreed that, in July 2019, she pled guilty to obstructing identification, a Class A misdemeanor. In August 2019, she lived in an Aurora apartment with defendant, who was her boyfriend. During the evening of August 18, 2019, she was socializing and drinking with Ann Scott and Robert Moroney, who lived in the next apartment unit. She had drunk "about three beers" when defendant joined the group. Defendant was angry at M.W. for being with the neighbors, and she was angry at him because she did not know where he had been for the past several hours. The two argued, and defendant hit M.W. "in [her] head" with a closed fist. She did not want the neighbors to see the argument, so she went back to her apartment. Defendant followed her back to the apartment.

¶ 7    They continued to argue in their apartment. M.W. was still angry over defendant's absence. She explained that she and defendant shared a single cell phone, which she had been unable to use because defendant had it while away. She asked defendant for the phone, but he would not give it to her. During the argument, he "grabb[ed her] and hit[ her], and threw [her] through the window." When asked to detail the nature of the physical contact, M.W. testified that the hitting "was just a[ ]lot of closed fist hitting me in my head, a[ ]lot of grabbing, a[ ]lot of shoving, kicking, swearing." As a result, she "had bruises all over [her] legs from [defendant]

either punching [her] or kicking [her]." Her arm went through the windowpane when she was "tussling to get him away from her." Defendant "jerked [her] arm back and it went through the [bedroom] window." Her right wrist hurt, and she saw what she thought was her "bone sticking out with blood everywhere." Defendant immediately ran. M.W. could not stop the bleeding, so she wrapped her arm in towels. She "went through several towels trying to stop the bleeding," but it would not stop. She walked to her neighbors' apartment to call an ambulance. She could not remember whether the police, firefighters, or emergency medical technicians were the first to arrive in response to her 911 call. She remembered answering questions from first responders, getting into the ambulance, and going to Mercy Hospital in Aurora. She further remembered getting staples in her arm.

¶ 8    M.W. identified a series of photographs as showing (1) the broken window in her apartment, (2) the cut on her right wrist before it was stapled, and (3) bruising on her right arm and left leg. One photo shows a cluster of bruises on M.W.'s inner right arm just below her shoulder. She described them as "grab marks." Another photo shows several large bruises on M.W.'s left shin. M.W. testified that she did not have the pictured bruises before the incident on August 19, 2019. The bruises in the photos are brownish purple.

¶ 9    On cross-examination, M.W. claimed that she did not remember talking to the police or being in a squad car on the night of the incident. She initially stated that her intoxication that night was the reason she could not remember a conversation in a squad car. However, later during cross-examination, she recalled that she was not in a squad car on the night of the incident, because she was placed immediately in an ambulance. She surmised that she had spoken to police in a squad car on a different occasion.

¶ 10    Also, despite initially claiming that she did not recall talking to the police, M.W. testified that she remembered an officer checking if there were marks on her.  Also, she was able to recall whether she made certain statements to the police.  She recalled telling the police that defendant "threw [her] arm through the window."  She denied telling the police that defendant was in the neighbors' apartment after she was cut.  She did not recall telling the police that defendant "punched-slapped" her in front of the neighbors.

¶ 11    M.W. was also cross-examined on her 911 call.  When asked if she had told the 911 operator that the perpetrator was still there with her, she said that she did not remember, because she was in shock during the call.  When asked whether she was also drunk, she responded, "And that, too."  She agreed that, when the operator asked how much she had to drink, she replied, "enough."  She admitted that she drank more than three beers while at the neighbors' apartment.  She claimed that she was "pretty intoxicated" and "[didn't] even remember [the 911] call."

¶ 12    The defense played the recording of the 911 call during M.W.'s cross-examination.  In the recording, M.W. tells the dispatcher that her "whole arm is split open" and that she wants to go to the hospital.  The dispatcher repeatedly asks M.W. how the injury occurred, but M.W. initially says that she just wants help.  She provides her address and a phone number.  When asked, she agrees that she has been drinking.  She denies that she could not recall how her injury occurred.  She tells the dispatcher that when she gets to the hospital she will explain what happened.  When the dispatcher becomes more confrontational, she says what sounds like, "You understand this is some domestic violence type of shit."  The dispatcher comments that she (M.W.) had not previously said that.  She responds that she is not supposed to.  The dispatcher asks her what she means by that.  She says something indecipherable, then says "he's here, too."  The dispatcher asks her where "here" is and whether her assailant is in the bedroom.  She responds, "He is right

here." The dispatcher asks if the assailant is outside. She says, "Oh my God!" and then apparently ends the call.

¶ 13    M.W. identified her voice on the call and remembered making the call, but she did not remember the content of the call. She said that the phone number she gave the operator was for a phone she had three years earlier.

¶ 14    M.W. also acknowledged on cross-examination that the towels she used to soak up the blood from her cut "would have been in the apartment when the police went in to search."

¶ 15    On redirect examination, M.W. stated that defendant had been with her at the neighbors' apartment for about 20 minutes before she left for her apartment. Her neighbors were present when she made the 911 call from their apartment.

¶ 16    Pursuant to the State's motion *in limine*, M.W. testified to other instances of abuse by defendant. She stated that, in November 2016, she had a relationship with defendant but was not living with him. On November 6, 2016, defendant wanted to drive a car that was titled in M.W.'s name. Defendant had been involved in purchasing the car. M.W. did not want defendant driving the car since he did not have a valid driver's license and was not on M.W.'s insurance. Defendant took the keys and sat in the driver's seat of the car. M.W. pursued and entered the car from the front passenger's side. She reached for the keys, and a struggle ensued. Defendant struck her repeatedly on the head, broke the facing off the radio, and pulled the rearview mirror off its mounting. When the neighbors called the police, defendant left, relinquishing the car and the keys. M.W.'s testimony about the incident was unrebutted.

¶ 17    M.W. further testified that, on September 16, 2019, at about 1:30 a.m., she was sitting in her living room. A light flashed on, and she discovered that defendant was present in the apartment. He started calling her names; she asked why he was there and told him to leave. He

knocked her off her chair, struck her in the head, kicked her, and choked her. He let her go after she repeatedly told him that she urgently needed to urinate. M.W. believed that defendant had come into the apartment through a window. M.W.'s testimony about this incident was unrebutted as well.

¶ 18    Jessica Kauth was the physician's assistant who treated M.W.'s arm at the Mercy Hospital emergency room on August 19, 2019. Kauth testified that the wound had ceased bleeding before M.W. arrived in the emergency room. After cleaning the wound, Kauth closed it with eight staples. The wound—which was about four centimeters long—was superficial, so it did not require internal sutures. The wound "was through the skin to the subcutaneous tissue, so you could see some of the fat that protects the muscle. It did not penetrate into the muscle." On cross-examination, Kauth said that she did not note any other lacerations or scrapes on M.W. She observed several contusions on M.W.'s arms but none on her face. The contusions were "darkish and purple in color." Kauth agreed that, more often than not, a bruise first appears as a reddish mark. She also agreed that one or two days can pass before the bruise turns purple. On redirect examination, Kauth agreed that it is not always possible to tell the age of a bruise by its appearance. She noted that "deep" contusions, such as those caused by squeezing, may not be manifest themselves for "a long time," and thus, depending on when the person seeks medical treatment, may not be visible to medical personnel.

¶ 19    Daniel Dispensa, an Aurora police officer dispatched in response to M.W.'s 911 call, testified that he arrived on the scene after the ambulance. M.W., whose cut was actively bleeding, was outside the building. He and another officer spoke with her and guided her to the ambulance. M.W. was never in a squad car with Dispensa or the other officer, but Dispensa recorded a conversation with her using a microphone that linked to the squad car camera. M.W. was scared,

crying, and upset when he was speaking with her. After the ambulance left, Dispensa spoke with defendant, who was already in the presence of other officers. Defendant smelled of alcohol and appeared intoxicated. Dispensa authenticated photographs he took in M.W.'s apartment showing, among other things, a broken pane of glass in a window and small blood spots on the floor. He explained that one photograph showed blood on the outside of a bathroom door.

¶ 20 On cross-examination, Dispensa agreed that defendant had allowed the police to search the apartment he shared with M.W. Dispensa did not find any bloody towels in the apartment. He agreed that all the broken glass he observed was inside the apartment. When Dispensa asked M.W. what had happened, she said that (1) her injury had just occurred, (2) she and defendant had been fighting because defendant thought that she had lost his phone, (3) defendant " 'tried to throw [her] through the window,' " cutting her arm; and (4) she then ran to the neighbors' apartment, he pursued her there, and he struck her in front of the neighbors. M.W. told Dispensa that defendant had struck her on the left side of the face. Dispensa saw a red mark on M.W.'s face but did not document it.

¶ 21 The State rested after Dispensa testified. Defendant moved for a directed verdict, and the court denied the motion.

¶ 22 Moroney testified for defendant. He said, that, on August 18, 2019, he, Scott, M.W., and defendant were all socializing in his and Scott's apartment. The gathering started midafternoon. They were drinking cocktails, talking, and watching television. Defendant and M.W. were "bickering." When asked if their conflict became physical, Moroney answered, "Not that I can recall or that I remember." Defendant and M.W. were in and out of the apartment. At some point after midnight, M.W. came back with a bleeding cut on her arm and asked to use Scott's phone.

Moroney tried to "patch her up;" he poured water on her arm and gave her a rag. Defendant was not there at the time. Moroney did not see M.W. use Scott's phone.

¶ 23    On cross-examination, Moroney admitted that, because he was intoxicated, he "really [didn't]" have a good recollection of the evening. He was not sure what times M.W. and defendant visited the apartment. Further, he could not positively say that he had not seen defendant do "anything physical at all towards [M.W.]"; he could say only that he did not remember any physical contact between them. Moroney acknowledged that he gave the police a recorded statement on August 19, 2019. He reviewed the statement before his testimony. He testified about the statement:

"Q. *** [D]o you recall whether or not [defendant] was being aggressive toward [M.W.] during this incident?

A. After listening to what I said, you know, I said they were pulling each other's arms, you know, tugging at each other, know what I mean?

Q. Okay. Was—was [defendant] being aggressive towards [M.W.]?

A. Yes.

Q. And specifically, you told the police that you saw [defendant] grab [M.W.], is that right?

A. Yes.

Q. And you said that that made you uncomfortable, right?

A. Yes.

Q. So you asked them to leave?

A. Yes.

Q. And they left?

A. Yes."

Moroney stated that, shortly after M.W. and defendant left, she came back with the cut on her arm.

¶ 24 On redirect, Moroney was again asked if defendant became physical with M.W.:

Q. *** Did you observe [defendant] punch [M.W.] on the head in your apartment?

A. No, well, I tell you, I don't remember. I knew for a fact he didn't hit her because if he did, there would have been a bigger problem.

Q. So you didn't observe him hit her in the face?

A. No. Like I said, I don't remember. I don't—I can't say that I did or I didn't, because I don't remember that."

¶ 25 Scott, also testifying for defendant, stated that, on August 18, 2019, defendant and M.W. were at the apartment she and Moroney shared. They were all drinking. She remembered that defendant was "being aggressive with" M.W. By "aggressive," she meant "just being loud with each other." She did not recall defendant punching or otherwise making physical contact with M.W. Scott asked defendant and M.W. to leave the apartment because they were arguing loudly. They both did leave, but M.W. later returned with a bleeding cut on her arm. Scott believed that M.W. had come back to get away from defendant. Scott let M.W. use her phone to call 911; defendant was not in the apartment when M.W. made the call.

¶ 26 On cross-examination, Scott testified that she was intoxicated that night, so her recollection was "[p]retty fuzzy." She thought that defendant and M.W. had arrived together at the gathering, but she was not sure. Defendant did not testify at trial.

¶ 27 During its deliberation, the jury sent a question to the court: "What is the difference between causing bodily harm & making contact of an insulting or provoking nature?" The court

answered, "The law that applies to this case is contained in the jury instructions that have been given to you."

¶ 28 The jury found defendant guilty of counts II and III, which alleged that defendant committed domestic battery (720 ILCS (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2018)) by pushing M.W., causing a laceration. The jury found him not guilty of the remaining charges.

¶ 29 Defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The court denied the motion, reasoning that the jury was entitled to believe M.W. on the critical issues:

> "Now, *** [M.W.], she was impeached in certain areas, but that does not mean she was incredible. It was up to the jury to believe her or to not believe her, and certainly, with respect to certain portions related to Counts 2 and 3, they did believe her based on their verdict."

¶ 30 The court found that count III (physical contact of an insulting or provoking nature) merged into count II (physical contact causing bodily harm) and sentenced defendant to 30 months' imprisonment. Defendant filed a timely notice of appeal.

¶ 31                                II. ANALYSIS

¶ 32 On appeal, defendant argues that M.W.'s testimony was "not sufficient proof that [he] committed the domestic battery of pushing [M.W.] into a window." Citing the rule that "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant" (*People v. Gray*, 2017 IL 120958, ¶ 36), he argues that M.W. was not such a witness. He contends that her testimony was insufficient to support the conviction because (1) she was admittedly "so drunk that she could not recall calling 911 or speaking with the police soon after the incident," and (2) her "testimony regarding what occurred

during and around the time of the purported domestic battery was contradicted by her prior statements and her two neighbors [with] whom [she] had been drinking."

¶ 33    In response, the State argues that the evidence was sufficient because M.W.'s testimony about how her arm was cut was consistent with the other evidence. The State notes that the testimony of Moroney and Scott was, in broad outline, consistent with M.W.'s testimony. Also, Moroney, Scott, Dispensa, and Kauth all confirmed the existence of the cut. The photos from M.W.'s apartment showed a broken window and blood on the floor.

¶ 34    Defendant replies that the State is taking a "piecemeal" approach to the evidence. He contends that, taken as a whole, M.W.'s testimony was "unconvincing and contrary to human experience" and that M.W.'s intoxication and her impeached statements constitute "multiple and significant facts adversely affecting [M.W.'s] credibility [that] cannot be considered in isolation."

¶ 35    We agree with the State. Although M.W. did not recall the night's events perfectly, there was sufficient corroborating evidence such that a rational jury could accept her testimony that defendant pushed her, causing her arm to break a window and sustain a laceration.

¶ 36    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237 (1985). When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

"Under [the standard of *Jackson* and *Collins*], the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. [Citation.] But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision. A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt." *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

The State is not required to present evidence that excludes every reasonable hypothesis of the defendant's innocence. *E.g.*, *People v. Larson*, 379 Ill. App. 3d 642, 654 (2008). Further, "circumstantial evidence is sufficient to sustain a criminal conviction, so long as the elements of the crime have been proven beyond a reasonable doubt." *People v. Milka*, 211 Ill. 2d 150, 178 (2004). " 'The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances' "; such evidence is " 'sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *Milka*, 211 Ill. 2d at 178 (quoting *People v. Hall*, 194 Ill. 2d 305, 330 (2000)).

¶ 37    The evidence, viewed in the light most favorable to the prosecution, is sufficient to sustain defendant's conviction. His guilty verdict was supported by a cohesive body of eyewitness testimony and circumstantial evidence. Scott and Moroney testified that defendant was aggressive toward M.W. during the gathering. M.W. and defendant left the apartment together, and, not long after, M.W. returned with a cut on her arm. Moreover, when the police searched the apartment M.W. shared with defendant, they found a broken windowpane as well as glass and blood on the

floor. Of course, M.W.'s testimony was the primary evidence of how her arm got cut, but her explanation was cohered with the other evidence.

¶ 38    Defendant identifies weaknesses in M.W.'s testimony, and the State offers mitigating explanations. We disagree with defendant that the State's explanations are a "piecemeal" approach to the evidence. Rather, the State's argument in support of the conviction relies on the evidence taken as a whole. The core of the State's argument is that M.W.'s "testimony regarding [d]efendant pushing her through a window and causing a laceration on her arm was consistent with the versions of others and establishes her credibility." This evidence, the State submits, "is sufficient to uphold [d]efendant's conviction of domestic battery." We emphasize that the State's evidence is not insufficient just because it is contradicted.

¶ 39    We agree with the State's critique of defendant's specific arguments. Defendant argues that M.W. lacked all credibility where she admitted drinking on the night of the incident and that she could not remember the 911 call. We note that M.W. did not consistently deny all recollection of the 911 call; her testimony varied on that point. Moreover, she recalled other events of the evening, such as the arrival of first responders and her treatment in the hospital. In any event, the State was not required to prove that M.S. had a perfect recall of the night's events. On the recording of the 911 call, M.W. tells the operator that her injury was the result of domestic violence. As noted, the police found evidence in M.W.'s apartment to support her account of how she sustained the cut. A reasonable jury could conclude that M.W. was truthful.

¶ 40    Defendant, however, argues that M.W. lacked credibility in that she described the gash as exposing bone when, according to Kauth, it went no deeper than the subcutaneous fat. But it is hardly unusual for someone who has just suffered a gash to overestimate its severity. Indeed,

Kauth's testimony likely explains M.W.'s misapprehension: whitish subcutaneous fat was exposed, and M.W. interpreted the white as bone.

¶ 41    Similarly, defendant argues that M.W.'s providing the 911 operator the number of a cell phone that she no longer had was deceptive, but it is equally plausible that this old number was the first to come to mind under the stress of the situation.

¶ 42    Defendant also notes that M.W. testified that she left bloody towels in her apartment, yet Dispensa found no such towels in his search.  This was an inconsequential discrepancy, as Scott and Moroney testified that they saw a bleeding cut on M.W.'s arm when she returned to their apartment.  Also, Dispensa observed blood spots and a broken window at M.W.'s apartment.  See *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 88 ("Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief.").

¶ 43    Defendant also argues that if he had, as M.W. claimed, struck her repeatedly with his fist, then "her head and face would have been bruised and bloody," yet there was no evidence of such injuries.  Defendant's point is not persuasive.  M.W.'s account of the abuse was sufficiently corroborated overall.  Officer Dispensa testified that he saw a red mark on M.W.'s face.  Moreover, M.W. did not specifically comment on the force or effects of the head blows.  Rather, she emphasized the kicks to her legs, which she claimed left the bruises shown in the photos.  Though Kauth noted that M.W.'s bruises had the color of older bruises, Kauth conceded that it is not always possible to judge the age of a bruise by its appearance, and she noted that deep bruises might take "a long time" to appear.

¶ 44    For the reasons stated, we conclude that defendant's conviction was supported by M.W.'s testimony and the circumstantial evidence.  Although M.W.'s recollection of the events was

contradicted at points, the jury could reasonably have credited her testimony about how she received the cut.

¶ 45                                    III. CONCLUSION

¶ 46    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 47    Affirmed.